998 So.2d 851 (2008)
STATE of Louisiana, Appellee,
v.
Derrick Termaine SUDDS, Appellant.
No. 43,689-KA.
Court of Appeal of Louisiana, Second Circuit.
December 3, 2008.
*854 Paula C. Marx W. Jarred Franklin, for Appellant.
Don M. Burkett, District Attorney, Brian H. Barber, Assistant District Attorney, for Appellee.
Before WILLIAMS, STEWART and DREW, JJ.
WILLIAMS, J.
A DeSoto Parish Grand Jury returned an indictment charging the defendant, Derrick Termaine Sudds, with second degree murder, a violation of LSA-R.S. 14:30.1, and attempted armed robbery, in violation of LSA-R.S. 14:64 and 14:27. Following a jury trial, he was convicted of attempted armed robbery and acquitted of second degree murder. The defendant was sentenced to serve 30 years in prison at hard labor. For the following reasons, the defendant's conviction and sentence are affirmed.

*855 FACTS
On September 18, 2006, the defendant and three of his high school classmates, Demarcus Hines, Billy Blow and Ronald Belsha, went to the home of an elderly man planning to rob him.[1] According to the testimony presented at trial, Belsha had informed the other teenagers that the victim, Vertis Booker, carried cash in his pocket. The defendant, who was driving, picked up the other three teenagers, and Belsha provided directions to the victim's house located outside of Mansfield, Louisiana. When they arrived in the vicinity of the victim's house, the defendant parked the vehicle nearby and the four young men walked to the house. Blow and Belsha went onto the porch and Belsha, who was known to the victim, knocked on the door and asked for water. The victim went into the house and returned with a pitcher filled with water and two foam cups. Belsha and Blow drank the water and asked for more. When Booker returned with more water, Blow, who was armed with a.22 caliber revolver, shot Booker twice, killing him.[2] The four young men ran to their vehicle while continuing to fire gunshots back towards the victim's house. They fled the scene in the defendant's car but drove back to get the money. However, they did not stop at the victim's house because a police car passed them traveling in the opposite direction. The defendant's vehicle was then stopped at a roadblock and the four teenagers were arrested. The police found two .22 caliber revolvers in the vehicle and a .25 caliber pistol in Hines' possession.
A grand jury indicted all four of the teenagers for second degree murder, in violation of LSA-R.S. 14:30.1, and attempted armed robbery, in violation of LSA-R.S. 14:64 and 14:27. Belsha and Hines pled guilty to attempted armed robbery, and Blow pled guilty to attempted armed robbery and manslaughter.[3] The defendant proceeded to jury trial. He was found not guilty of second degree murder and guilty of attempted armed robbery. Subsequently, he was sentenced to serve 30 years at hard labor. This appeal followed.

DISCUSSION

Sufficiency of Evidence
The defendant contends the evidence was insufficient to support his conviction for attempted armed robbery. The defendant argues that the state failed to prove beyond a reasonable doubt that he possessed the specific intent to take anything of value from the person of another while armed with a dangerous weapon. The defendant also argues that the evidence failed to establish that he knew of any plans to rob the victim or that he committed any act for the purpose of accomplishing an armed robbery.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the *856 sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La. 10/17/97), 701 So.2d 1333.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, XXXX-XXXX (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in LSA-C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, XXXX-XXXX (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. LSA-R.S. 14:64(A). LSA-R.S. 14:27 provides, in pertinent part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
* * *
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. LSA-R.S. 14:24.
In the instant case, the defendant's three co-perpetrators testified during the trial. Hines testified that on the day in question, the defendant called him and asked him to ride with him. The defendant picked Hines up, then drove to pick up Blow and Belsha, telling Hines that he was taking Blow and Belsha to get some money from a man who owed them. Hines denied having a gun with him when he got *857 into the defendant's vehicle. According to Hines, Belsha directed the defendant to the victim's house located outside of town. Hines stated that when they arrived at the house, the defendant parked the vehicle nearby and the four young men walked to the victim's house. Hines stated that Blow and Belsha went onto the porch and Belsha asked the victim for some water. The victim went into the house and returned with a pitcher of water and some foam cups. Belsha and Blow drank the water and asked for more. When the victim returned with more water, Blow pulled a gun from his back pocket and fired three times, shooting the victim. Hines testified that he and the defendant started running back to the car, followed by Belsha. He stated that Belsha and the defendant stopped in the road and Belsha got on his knees and curled his body on the ground, saying, "[H]e must have thought [the victim] had a gun or something." The young men where soon joined by Blow, and the defendant and Blow began "shooting up the [victim's] house." Hines stated that the last time he saw the victim was when he fell into the house after being shot. He stated that Blow initially followed the victim but he thought Blow stopped at the door because the defendant "told him to come on." Hines also testified that they got back into the car and drove towards Pelican, Louisiana. He stated that they then turned around and drove back towards the victim's house because Blow told the defendant to go back. Hines stated that they did not stop at the house because a police car passed them coming from the opposite direction. He stated that the defendant and Blow reloaded their guns while the defendant drove the vehicle. The defendant's vehicle was then stopped at a roadblock and the four teenagers were arrested.
Hines also testified that he saw several guns that day  two .22 caliber revolvers and a .25 caliber pistol. He stated that he saw the .25 caliber weapon when he got back into the car after the shooting. Hines testified that the gun was under the console and he tried to hide it but "then it ended up in my pocket." He claimed that the gun was never fired. Hines testified that the defendant threw his gun onto the floorboard and he (Hines) kicked the gun under the seat. Hines admitted that he was originally charged with second degree murder and attempted armed robbery and that he had pled guilty to attempted armed robbery.
During cross-examination, Hines repeated his account of the events that occurred on that day and reiterated that he did not know that the robbery had been planned. Hines stated that he pled guilty to avoid the possibility of a life sentence and he admitted that a part of his plea agreement was to testify against the defendant. Hines claimed he did not know that Blow had a gun until Blow shot the victim and did not know that the defendant had a gun until after the victim had been shot.
Belsha also testified at the trial. He stated that he did not know the defendant personally, claiming that he had one class with the defendant, but had never associated with him. Belsha testified that they ended up together on the day of the crime through their association with Blow. Belsha indicated that he, the defendant and Blow had discussed going to the victim's house at school on the day of the crime. According to Belsha, Blow had asked him the day before if he knew where the victim lived because the victim owed him money. Belsha testified that the other three young men all had guns and he saw the guns immediately before they arrived at the victim's house. He claimed they had not discussed what was going to happen other than getting some money. According to *858 Belsha, when they reached the victim's house, all four of them walked up the victim's driveway, and Blow told him to ask for water. Belsha walked closer toward the porch and asked for water, which the victim brought. He stated that Blow told him to ask for more water, and when the victim returned with more water, Blow walked over and got the water, hesitated for a second, and then pulled out his pistol and shot the victim twice. Belsha testified that they started running, although "Blow acted like he wanted to go in the house." He stated that Hines stopped running and told Blow to come on, while he and the defendant kept running. Belsha stated, "They [the defendant, Hines and Blow] all of a sudden stood up and shot at the house." Belsha testified that they got back into the car and headed toward Pelican, but after going a couple of miles, Blow told the defendant to go back because he did not get anything. Belsha stated that the defendant turned the vehicle around and started back towards the victim's house. However, as they passed the house, a police patrol car passed them. They also passed an ambulance and then came to the roadblock. According to Belsha, Blow threw his gun under the defendant's seat and the defendant had handed his gun to Hines to reload while the defendant was driving.
On cross-examination, Belsha testified that Blow had told him that the victim owed him money, "but that if he didn't have his money  well he was gonna take it by force if he didn't want to give it to him." Belsha admitted that he pled guilty to attempted armed robbery to avoid being convicted of second degree murder and receiving a life sentence.[4]
Blow also testified at the trial with regard to the events of the day in question. He stated that he knew the defendant from having gone to school with him. He stated that on the day of the incident, he agreed to participate in the robbery of the victim after Belsha suggested it. Blow stated that he told the defendant that Belsha "knew this man that we could get some money from." After school, the defendant picked up Hines, and then Blow and Belsha. Blow admitted taking a .22 caliber gun with him. According to Blow, Hines and the defendant had guns and the defendant had shown his gun to him earlier that day. Blow testified that Belsha gave the defendant directions to the victim's house and when they arrived, Belsha asked the victim for water. After drinking the water, Belsha asked for more water. Blow testified that when the victim returned, he shot the victim because the other three boys told him to shoot him. Blow also testified that he went to the house with the intent to rob the victim because Belsha had told him that the victim had money. Blow stated that they all ran after the shooting and that the defendant and Hines fired shots at the house before getting into the car. Blow stated that they drove away from town at first, but then turned around. He claimed that he did not know why the defendant turned around. He testified that when they were stopped at the roadblock, he put his gun on the floor "under the back seat." Blow admitted to reloading the pistol while he was in the car, using bullets that were in a glove the defendant had given him. Blow admitted that he had also been charged with second degree murder and attempted *859 armed robbery and that he had pled guilty to manslaughter and attempted armed robbery. Blow ended his direct testimony by testifying that the defendant knew about the plan to rob the victim and that no one forced or threatened the defendant to drive them to the victim's house.[5]
Arease Booker, the victim's 93-year-old mother, also testified at the trial. She testified that she was in the house when the crime took place. She stated that she saw four boys walk up the driveway, and shortly thereafter, her son came inside of the house to get the boys some water. When the victim came back for more water, Ms. Booker asked the victim who were the boys and he told her that "one of them is Boy George's son" (Belsha). Ms. Booker testified that when the victim went outside with the water, "by the time he got half way back where they were, they shot him." She stated that she initially heard "about three" gunshots and then she heard multiple gunshots after her son was shot. She stated that when the victim came back inside of the house, he told her, "[T]hat boy's got a gun ... [h]e shot me." Ms. Booker testified that she asked the victim who he was referring to and he replied, "Boy George's son." She stated that those were her son's last words. Ms. Booker called 9-1-1 and stayed with her son until the authorities arrived. She testified that she did not see the shooting and was unable to identify the perpetrators, admitting that she "just saw them from a distance."
Louisiana State Trooper John Jett also testified. He stated that he was near the area of the shooting when he heard over the dispatch radio that shots had been fired at a residence on Antioch Road. Trooper Jett stated that while enroute to the scene, he received the description of a suspect vehicle, a white car. He testified that deputies and the ambulance personnel reported that while they were on their way to the scene of the shootings, they had seen a white vehicle with dark tinted windows. Trooper Jett and a sheriff's deputy created a roadblock and stopped the defendant's vehicle. After several requests, the occupants of the vehicle stepped out, with the driver, the defendant, exiting first. Trooper Jett testified that a search of the defendant's vehicle revealed weapons and ammunition. He stated that a glove containing bullets was discovered in the vehicle and that the glove matched one taken from the defendant's rear pocket.
After reviewing the record, we find that the evidence was sufficient, under the Jackson standard, to support the jury's verdict of guilty of attempted armed robbery. Blow testified that the defendant knew of the plan to rob the victim and that no one forced or threatened the defendant to participate. He also testified that he knew the defendant had a gun because the defendant had showed it to him earlier that day. Blow, Hines and Belsha all testified that the defendant was armed with a gun and fired shots at the victim's house after Blow shot the victim. Belsha indicated that Blow said he wanted to go back because he did not get anything, and that the defendant then turned around and drove back toward the victim's house. Blow also testified that the defendant was one of the boys that told him to shoot the victim. Furthermore, Blow admitted to reloading the pistol while in the car, using bullets that were in a glove that the defendant gave him. The evidence showed that the police officers discovered a glove with *860 bullets in it which matched the glove in the defendant's possession.
Viewing the evidence in a light most favorable to the prosecution, we conclude that the jury could have found, beyond a reasonable doubt, that the defendant was a principal to the attempted armed robbery. The defendant knew an armed robbery was planned, he helped attempt to execute the armed robbery by driving his co-perpetrators to the victim's house, and he went to the victim's house armed with a handgun. The jury also heard testimony that the defendant encouraged Blow to shoot the victim and that defendant gave Blow bullets to reload his weapon. The evidence presented also showed that the defendant drove back towards the victim's house when Blow stated that he wanted to return because he did not get anything the first time. Consequently, there was ample evidence presented to the jury to support its verdict of guilty of attempted armed robbery.
This assignment of error lacks merit.

Motion for Mistrial
The defendant contends the trial court erred in failing to grant a mistrial "after making prohibited comments regarding questions posed by defense counsel to a prosecution witness." The defendant argues that a mistrial was warranted because the trial judge made prejudicial comments to the jury to the effect that defense counsel was seeking to mislead the jury with his questioning.
Upon motion of the defendant, a mistrial shall be granted when a remark or comment made within the hearing of the jury by the judge, district attorney or a court official, during the trial or in argument, refers directly or indirectly to: (1) race, religion, or national origin, if the remark or comment is not material and relevant and might be prejudicial against the defendant in the mind of the jury; (2) another crime committed by the defendant as to which the evidence is not admissible; (3) the failure of the defendant to testify in his own defense; or (4) the refusal of the judge to direct a verdict. LSA-C.Cr.P. art. 770.
In the instant case, during his cross-examination, Hines indicated that he was hoping to receive a lesser sentence by testifying against the defendant. Defense counsel then asked, "Do you think that your sentence, the length of your sentence is gonna depend on whether or not [the defendant] gets convicted." The trial court then asked defense counsel to approach the bench, and after a brief conference outside of the hearing of the jury, the court addressed the jury as follows:
Ladies and Gentlemen, so there's no misunderstanding, Mr. Gold's questioning leaves, in my opinion some misunderstanding. Mr. Hines has pled guilty as he stated. His sentence will be up to me. I will be sentencing him. There is no sentencing recommendation from the District Attorney's Office. The sentence will be up to me. The plea agreement was that he would testify truthfully. Now anything else beyond that is misleading.
Defense counsel objected to the court's comments and a discussion took place outside of the presence of the jury. Defense counsel moved for a mistrial, arguing that the court's statement that defense counsel's questions were misleading was the basis for a mistrial; the motion was denied.
After reviewing the transcript, we find that the trial court's comments do not fall under the purview of LSA-C.Cr.P. art. 770. The comments clearly did not refer to race, religion or national origin, another crime committed by the defendant, the *861 failure of the defendant to testify or the refusal of the judge to direct a verdict.
LSA-C.Cr.P. art. 771 provides:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
LSA-C.Cr.P. art. 772 provides:
The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.
Mistrial is a drastic remedy, and the determination of whether prejudice to the defendant has resulted from the judge's or prosecutor's comments lies in the sound discretion of the trial judge. See, State v. Draughn, XXXX-XXXX (La.1/17/07), 950 So.2d 583; State v. Leonard, XXXX-XXXX (La.6/16/06), 932 So.2d 660; State v. Jones, 41,299 (La.App.2d Cir.11/9/06), 942 So.2d 1215. The trial court has discretion to determine whether a fair trial is impossible, or whether an admonition is adequate to assure a fair trial when the alleged misconduct does not fit into the provisions for a mandatory mistrial, and the ruling will not be disturbed on review absent an abuse of discretion. State v. Jones, supra; State v. Powell, 598 So.2d 454 (La.App. 2d Cir. 1992), writ denied, 605 So.2d 1089 (La. 1992).
We find no abuse of discretion in the trial court's denial of the motion for a mistrial. Our review of the trial court's comments reveals that the court indicated that a question posed by defense counsel could lead to "some misunderstanding" and indicated that any questioning beyond the agreement that Hines would testify truthfully "is misleading." The court made it clear to the jury that there was no plea agreement with regard to Hines' sentence and expressed the fact that the sentence to be imposed was at the sole discretion of the sentencing judge. Following the court's statements, there was no request for an admonishment of the jury as provided by LSA-C.Cr.P. art. 771. Defense counsel moved for a mistrial, a remedy not expressly provided for under that article, unless the court is satisfied that an admonishment is not sufficient to assure the defendant a fair trial. Absent a request to do so, a trial court need not admonish the jury. State v. Jackson, 2004-293 (La.App. 5th Cir.7/27/04), 880 So.2d 69; State v. McPherson, 98-1207 (La.App. 5 Cir. 3/30/99), 733 So.2d 634. Consequently, this assignment is without merit.

Cross-Examination of Witnesses
The defendant contends the trial court erred in refusing to allow defense counsel to cross-examine a prosecution witness *862 with regard to his plea agreement. The defendant argues that Hines' testimony with regard to his belief that he would receive a lesser sentence if his testimony led to the defendant's conviction would have served to show that Hines was biased and motivated to testify untruthfully to gain a personal advantage.
A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. LSA-C.E. art. 611(B). The trial court is empowered to exercise reasonable control over the manner of cross-examination so as to (1) ensure the effectiveness of the interrogation as a mode of ascertaining the truth; (2) avoid the needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment. LSA-C.E. art. 611(A). "Subject to the discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, or discredit, the witness." State v. Robinson, XXXX-XXXX (La.5/17/02), 817 So.2d 1131, 1135. The ruling of the trial court as to the scope and extent of cross-examination should not be disturbed absent an abuse of the court's broad discretion. State v. Irish, 2000-2086 (La.1/15/02), 807 So.2d 208, cert. denied, 537 U.S. 846, 123 S.Ct. 185, 154 L.Ed.2d 73 (2002); State v. Frost, XXXX-XXXX (La.12/1/98), 727 So.2d 417, cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999).
In this case, we conclude that any speculation by Hines with regard to whether he believed he might get a lighter sentence if the defendant was convicted had virtually no relevance. The jury already knew that Hines had made a plea bargain to testify against the defendant in exchange for Hines' guilty plea to a lesser charge. There is no evidence in this record which suggests that Hines had reason to believe that he would receive a more lenient sentence if the defendant was convicted. As stated previously, the trial court correctly clarified for the jury the fact that the terms of Hines' sentence were at the sole discretion of the judge and were not included in any plea agreement. This assignment lacks merit.

Sentence
The defendant further contends the sentence imposed by the trial court was excessive for this offense and this offender. He argues that he was sentenced to 30 years despite his age, his lack of criminal history and the contradictory evidence presented to the jury with regard to his knowledge that the crime was going to be committed. The defendant also argues that the trial court erroneously considered the "benefit" he received from the jury's verdict, acquitting him of second degree murder. The defendant maintains that the jury concluded the State failed to meet its burden of proving that he was guilty of second degree murder, and therefore, any "benefit" he received was not based "upon any favors done for the Defendant as the other participants received via plea bargains."
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in LSA-C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890, writ denied, XXXX-XXXX (La.3/28/08), 978 So.2d 297. The articulation *863 of the factual basis for a sentence is the goal of LSA-C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with LSA-C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Hampton, 38,017 (La.App.2d Cir. 1/28/04), 865 So.2d 284, writs denied, XXXX-XXXX (La.3/11/05), 896 So.2d 57 and 2004-2380 (La.6/3/05), 903 So.2d 452. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La. 1981); State v. Haley, 38,258 (La.App.2d Cir.4/22/04), 873 So.2d 747, writ denied, 2004-2606 (La.6/24/05), 904 So.2d 728. There is no requirement that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La. App.2d Cir.12/13/06), 945 So.2d 277, writ denied, XXXX-XXXX (La.9/28/07), 964 So.2d 351; State v. Jones, 33,111 (La.App.2d Cir.3/1/00), 754 So.2d 392, writ denied, XXXX-XXXX (La.2/2/01), 783 So.2d 385.
Second, a sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, XXXX-XXXX (La. 1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La. 1992); State v. Robinson, 40,983 (La. App.2d Cir.1/24/07), 948 So.2d 379; State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864.
In selecting a proper sentence, a trial judge is not limited to considering only a defendant's prior convictions, but may properly review all prior criminal activity. State v. Russell, 40,526 (La.App.2d Cir.1/27/05), 920 So.2d 866, writ denied, XXXX-XXXX (La.9/29/06), 937 So.2d 851; State v. Jackson, 612 So.2d 993 (La.App. 2d Cir.1993). The sources of information relied upon by the sentencing court may include evidence usually excluded from the courtroom at the trial of guilt or innocence, e.g., hearsay and arrests, as well as conviction records. State v. Myles, 94-0217 (La.6/3/94), 638 So.2d 218. These matters may be considered even in the absence of proof the defendant committed the other offenses. State v. Estes, 42,093 (La.App.2d Cir.5/9/07), 956 So.2d 779.
In the instant case, the trial court noted that the defendant and his co-perpetrators were all 16 years old at the time of the crime. However, the court took into account that an elderly man was shot to death during this attempted armed robbery. The court stated:
Derrick Sudds was the driver without who [sic] this crime would not have happened. He shot at the residence after Blow fatally shot [the victim]. He returned to the residence trying to complete the robbery. Not only did Sudds have a .22 caliber pistol that he used, he also had a .25 caliber pistol in his car that he gave to Hines.... After knowing the others were going to rob [the victim], he got out of the car and walked into [the victim's] yard with the other three.
The court also stated that the defendant had "benefitted from the jury finding him not guilty of second degree murder."
*864 We note that the 30-year sentence appears harsh for this young first offender. However, the evidence showed that the defendant was a co-conspirator and an active participant in an attempted armed robbery during which he was armed with a dangerous weapon, a man was shot and killed, and he further endangered human life by firing additional gunshots at the inhabited dwelling. Thus, we find that the trial court did not abuse its discretion in sentencing the defendant. The sentence is not constitutionally excessive. This assignment lacks merit.

ERRORS PATENT
We have examined the record and note the presence of one error patent. The trial court failed to specify that the defendant's sentence for attempted armed robbery must be served without benefit of parole, probation or suspension of sentence pursuant to LSA-R.S. 14:64 and 14:27. When a trial court fails to order that a sentence should be served without benefits as mandated by statute, those required restrictions are self-activating and there is no need to remand for a ministerial correction of an illegally lenient sentence. LSA-R.S. 15:301.1(A); State v. Williams, XXXX-XXXX (La.11/28/01), 800 So.2d 790; State v. Braziel, 42,668 (La.App.2d Cir.10/24/07), 968 So.2d 853.

CONCLUSION
For the reasons set forth herein, we affirm the defendant's conviction and sentence.
CONVICTION AFFIRMED; SENTENCE AFFIRMED.
NOTES
[1] At the time of the crime, the defendant, Hines, Blow and Belsha were all 16 years old.
[2] Dr. James Traylor, Jr., the coroner, testified concerning the cause of death. He stated that the victim had received two bullet wounds  a non-fatal wound to the shoulder and a fatal wound to the abdomen that lacerated an artery and caused him to bleed to death internally in a matter of minutes.
[3] Hines and Belsha were both sentenced to serve 30 years at hard labor. Blow was sentenced to serve 30 years on each conviction, with the sentences to be served consecutively. The convictions and sentences were affirmed by this court. See, State v. Belsha, 43,623, 43,624, 43,625 (La.App.2d Cir. 10/22/08), 997 So.2d 162.
[4] The defense recalled Belsha to attack his credibility with regard to his testimony that the reason the defendant turned the vehicle around was because Blow said he did not get anything. Belsha had claimed that the first time he made this statement was when officers had initially questioned him. However, a transcript of his recorded statement did not substantiate his claim.
[5] On cross-examination, Blow admitted that he had lied in a previous statement to police officers when he had stated that Belsha had shot the victim and that he (Blow) was the only one who shot at the house. He repeated his account of the events of the crime and stated that he shot the victim because the defendant and Hines told him to do so.