BLEICH, J. (Pro Tempore )
*699 This criminal appeal arises from the Fifth Judicial District Court, Parish of Richland, the Honorable Glen Strong presiding. After a jury trial, Defendant Larry R. Brown, Jr., was found guilty as charged of the second degree murder of Michael Bradley and possession of a firearm by a convicted felon. Brown was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on the second degree murder conviction, and ten years imprisonment at hard labor on the possession of a firearm by a convicted felon conviction. He was given credit for time served in actual custody prior to imposition of sentence, and the sentences were ordered to run concurrently. A timely filed motion to reconsider sentence was denied. Brown has appealed, asserting only that the trial court erred in denying his motion to continue the trial. Brown's convictions and sentences are affirmed.
FACTS
On November 19, 2015, Defendant Larry R. Brown, Jr., was charged by bill of indictment with the September 28, 2015, second degree murder of Michael Bradley. Brown pled not guilty, and the Indigent Defender Board was appointed to represent him. On January 26, 2016, defense counsel filed a motion for discovery. On February 25, 2016, Brown filed a pro se motion for speedy trial, which was never adopted by defense counsel, and this motion was set for hearing on March 30, 2016.[1] In April 2016, Brown filed pro se requests for court minutes, which were provided to him; for a police report and affidavit, which was denied as not in the custody of the clerk; and for the transcript of the March 30, 2016 hearing on the motion for speedy trial, which was granted. On May 23, 2016, the state filed its initial response to discovery, and on March 3, 2017, it filed a supplemental response to discovery.
On May 5, 2017, Brown was charged in a separate docket number by bill of indictment with possession of a firearm by a convicted felon in connection with the murder of Bradley.
On January 3, 2018, the district attorney filed an amended indictment for the sole purpose of consolidating the two charges.[2] At the time of the filing of the amended indictment, Brown had been arraigned on both charges.
On January 24, 2018, the state filed a La. C. Cr. P. article 768 Notice[3] advising *700 that it intended to introduce statements made by Brown to investigators, as well as statements made by Brown to witnesses Danielle Collins, Rosemary Cleveland, Terrance Miles, Robert Earl Miles, and Amanda McKenzie. Transcripts of the statements of Danielle Collins, Terrance Miles, and Robert Miles were produced to the defense in the state's initial discovery responses of May 23, 2016. Transcripts of the statement of Amanda McKenzie were produced in the state's supplemental response to discovery of March 3, 2017. The record does not indicate that a transcript of any statement of Rosemary Cleveland was produced to the defense prior to the article 768 notice. On February 5, 2018, the state filed a supplemental article 768 notice indicating its intent to introduce additional statements made by Brown to Rosemary Cleveland during a jailhouse phone conversation. The notice indicates that this information was obtained during an interview with Ms. Cleveland the day before the notice, on Sunday, February 4, 2018.
In the meantime, on January 31, 2018, defense counsel filed a motion to continue and reset the trial that was scheduled for February 5, 2018. The motion cited the extended illness of IDB investigator Jamie Hudson and alleged that the IDB had been without an investigator "for a number of months" due to Hudson's illness. Brown alleged "a number of issues that need to be addressed which require an investigator," including statements allegedly made by Brown as noted in the state's initial Article 768 notice. The motion was heard that same day.
During the hearing, defense counsel noted the illness and absence of Hudson. Counsel stated that this was the first continuance sought by the defense and contended that there would be no prejudice to the state if the motion was granted. Counsel cited the state's Article 768 notice and argued to the court that he had "been given" the names of several witnesses, and he did not know where they lived, and he "would love to have an investigator go out and talk to these people and tell me what - what he feels they're going to say and interview them...." Counsel also noted that the state's eyewitness had been appointed new counsel, and this weighed in favor of the continuance.
The district attorney countered by first noting that the state would be prejudiced by a continuance due to the increased chance of losing witnesses, memories fading, and other problems and health issues of certain unnamed witnesses. The district attorney then emphasized that the case was two years old and referenced the fact that in 2016, Brown had filed a motion for speedy trial indicating his readiness to proceed to trial. The district attorney pointed out that defense counsel had questioned the lead investigator the previous year at the bond reduction hearing. He further noted that the state had complied with all discovery in prior years by providing all of the information necessary for defense counsel to investigate and prepare for trial. The district attorney argued that there was ample time to investigate prior to Hudson's illness, and at no time did the IDB make a request for another investigator during Hudson's illness.
John Ellis, the newly appointed Chief Public Defender, also addressed the trial court. Ellis explained that he had been recently told by the interim chief that Hudson had been ill, and, after further inquiry, he learned that Hudson had passed away. Ellis advised that he then took immediate steps to hire a new investigator. He also informed the court that his *701 office was not in possession of the files on which Hudson had been working. Ellis advocated in favor of allowing Brown the benefit of the new investigator's services.
Following argument the trial court denied the motion to continue, explaining as follows:
Okay. Usually within forty-eight hours or seventy-two hours I think an attorney's appointed, I don't know was appointed in that particular situation, but an attorney has been on this case virtually from the moment of arrest. There has been as [defense counsel] stated Mr. Hudson, the former investigator was an outstanding investigator. He was - I don't know exactly who he was working for when I was serving full time as judge but he was in court virtually every time had court on some case, both as an investigator for the Public Defender's Office and as a private investigator on his own right in some domestic cases. And in a domestic case that I dealt with a couple of weeks ago he was the investigator until very recently on that case, so there has been an investigator in the case for almost two years. I think Mr. Hudson - I saw his obituary, I noticed he had passed away over the weekend, I think his funeral was Monday. But I understand that he was - actually had made a court appearance two weeks prior to that. He was, as [defense counsel] argued in chambers, had had made several trips to Colorado for some type of medical treatment but he was still active and working the case. As a public defender myself for five years, we didn't have investigators, we investigated our own cases, that was part of the job to get prepared. And I would have loved to have had an investigator to assist me but I didn't, so I had to do the shoe leather routine and get out and go take measurements of crime scenes and prepare myself, I had to interview witnesses and other people that was referred to me. I understand from argument in chambers, [addressing defense counsel], that sometimes it's difficult to present evidence when you're the one that has to interview but you're the one that's got to know what people are going to say so that you can make your cross-examinations more effective of the state's witnesses and perhaps have witnesses of your own. But this case is a couple of years old, and by the time that it's continued again it'll be three years old, because of the way the rotation works in this district there's not another available date. And if you had been sitting here listening all day long I had fourteen pages of cases that were scheduled to be heard at this next week and for the past several hours I've been kicking them back, kicking them back, kicking them back to August, and some of those, Mr. Ellis, are very serious cases, too. And so there comes a time when we have to do what we have to do and this is that time. So the motion to continue will be denied and we'll be ready to go to trial on this case on Monday.
After the ruling, there was an indication by defense counsel that he may have intended to take a writ, but none was filed. The district attorney stated that, as had been the case for the previous month, his office was "open and available" to defense counsel for anything he may need over the weekend. The matter proceeded to trial the following week.
The following testimony and evidence was presented by the state at trial. Brown arrived at his Aunt Mary Miles' trailer at 108 Blackmon in Rayville, Louisiana, around 5:00 a.m. on the day of the shooting. He was wearing camouflage clothing and a black mask that was rolled up like a *702 cap and was carrying a gun case. Mary Miles' sons, Terrance Miles and Robert Miles, cousins of Brown, were at home when he arrived. Brown plugged his cell phone in to charge in Terrance's bedroom. Around 7:00 a.m., Terrance and Robert went outside to play dominoes. Mary Miles returned home in the meantime. Around 2:00 p.m., the victim, Michael Bradley, drove up to the Miles trailer and got out of his truck, leaving the engine running. Bradley was Terrance Miles' best friend and, the record indicates, was also a friend of Brown's. Bradley asked Terrance if he wanted to ride to Monroe with him and then walked behind a parked truck to urinate. When Bradley walked back around, shots were fired at him. Terrance and Robert ran down the street. Bradley was shot multiple times. When the shooting ceased, Terrance walked back into his yard and saw Bradley lying on the ground dead. Neither Terrance nor Robert could definitively say from which direction the shots were fired, but neither boy saw anyone shooting from outside the trailer. Terrance testified that, after the shooting, he saw Brown, still dressed in camouflage, running behind the trailer house. Robert testified that Brown did not leave the trailer from the time he arrived early that morning. Both boys testified that the only people in the trailer were their mother and Brown.
Mary Miles testified that she was in her bedroom when she heard the first shot. She walked into the kitchen and saw Brown with a gun propped on a Folgers coffee can pointed out the kitchen window. She spoke to him, he looked at her, pulled the cap/mask down over his face and began firing out the window. Mary testified that she was so scared she covered her face with her hands and urinated on herself. She was unable to move from fear, and when she uncovered her face, she saw Brown put the gun, an AK 47, between mattresses in a nearby bedroom and run out of the trailer. Mary testified that at first, she thought that Brown had been shooting at her sons. She went outside and saw Michael Bradley's body on the ground.[4] Terrance testified that, after the shooting, he saw Brown run out of the trailer and toward the woods.
The police arrived and a subsequent search of the home revealed the scene in the kitchen as Mary Miles described, with a chair against the counter in front of the sink and the coffee can set up like a "prop." The window over the sink was blown out and the trim was destroyed. An assault rifle was found between the mattress and the box spring in one of the bedrooms. Fingerprint analysis revealed a latent fingerprint on the rifle's magazine that was positively matched to Brown. Several other loaded guns (allegedly belonging to Brown) were found in Mary's trailer and Brown's cell phone was found charging in Terrance's bedroom.
Later that afternoon, Brown went to a neighborhood convenience store called the Hornet's Den. Oliver Holland, the proprietor, testified that Brown was dressed in sweatpants without a shirt, and his shoes were muddy. Tyreace Haynes, who testified that Brown was "like" his uncle, saw Brown at the Hornet's Den around 6:00 p.m. and agreed to let Brown use his cell phone. The calls would not go through because Tyreace did not have any prepaid minutes left on his phone. Brown went into the store and asked Holland to use the business phone. Holland agreed, and although he did not hear Brown's conversation, *703 thought that Brown called his mother to ask her to let him into her house, which was "just down the street." Tyreace told Brown that Michael Jr. was "gone," and Brown asked him "who did it?" before telling Tyreace that Brown needed to get out of Rayville because the police were looking for him. Tyreace testified that Brown's mother then pulled up outside of the store and told Brown that "he needed to get his evidence out of her house."
Danielle Collins testified that, at the time of the shooting, she had been dating Brown for three or four months. Danielle stated that Brown showed up at her house in Monroe after the shooting. She had seen a report on the local news about the murder and the suspected shooter (which was Brown). Danielle asked Brown "why did you do it" and he said "it had to be done," and that he just "walked up on the boy." Rosemary Cleveland, an ex-girlfriend of Brown's, testified that she had been arguing with Brown the day of the shooting and that he texted and called her, telling her, among other things, that he was watching her. Mary's trailer was down the street from Rosemary's mother's house and Rosemary testified that, on the day of the shooting, she was outside within view of Mary's trailer. Rosemary saw Michael drive by, going toward Mary's trailer, but she did not hear the shots fired at Michael. Brown called Rosemary later that afternoon from the Hornet's Den. He also called her "a lot" from jail and during one conversation, asked her to get her son, "Boo," to "get that thing from Buck[5] and them ... it's under the mattress" at Mary's house.
The state rested and the defense did not call any witnesses. Brown was convicted as charged and subsequently sentenced. This appeal followed.
DISCUSSION
In his sole assignment of error, Brown argues that the trial court abused its discretion in denying his motion to continue the trial based on the death of Jamie Hudson, the Indigent Defender Board's investigator assigned to his case. According to Brown, there are "certain things" that require more investigation in his case, including interviewing the witnesses listed on the state's article 768 notice. Further, Brown notes that Hudson, the only investigator with the IDB, had been ill for a period of time before his death. Brown states that Hudson was not able to do investigative work, and another investigator had been appointed to take over his case. Brown reurges his trial counsel's argument to the trial court, which was that "a lack of a proper investigation violated a sense of fairness and fair play and a trial without such an investigation would result in a substantial injustice." Brown seeks reversal of his conviction and sentence and remand.
The state makes the following observations in support of the trial court's exercise of discretion in denying Brown's motion for continuance:
• The case had been pending for more than two years and there was ample time to investigate.
• Brown had the same attorney from arraignment to trial.
• The defense was aware in 2017 that the matter was a priority for the February 2018 trial setting.
• The state maintained "open file" discovery and provided all discovery to the defense well before trial, and that all discovery was filed into the record.
*704 • While the state's 768 notice was filed on January 24, 2018, the witnesses were not a surprise, and that their statements had been previously provided to the defense during discovery.
• Brown filed a motion for speedy trial in February 2016 indicating that he was ready for trial.
• Despite Hudson's illness, no pleading or request was filed seeking supplemental funds to hire a new investigator.
• The state timely complied with all discovery requests of the defense. However, in July 2017, the court ordered the defense to comply with the state's discovery request, which the defense had still failed to do as of the January 31, 2018 hearing on the motion to continue.
The state argues that, while a defendant is constitutionally entitled to an attorney, the constitution does not entitle a defendant to an investigator. The state points out that many attorneys try criminal cases without the benefit of an investigator and no evidence was presented that defense counsel was in any way precluded or prevented from conducting an investigation and speaking to witnesses on his client's behalf. Finally, the state notes that the assistant district attorney advised the trial court that the state would suffer prejudice from a continuance of the trial, in that a delay of six months to one year would increase the chance that the state would lose witnesses, their memories would fade, and some of the witnesses had medical issues.
Upon a written motion at any time and after a contradictory hearing, the trial court may grant a continuance, but only upon a showing that such a motion is in the interest of justice. La. C. Cr. P. art. 707 ; State v. Saulsberry , 52,031 (La. App. 2 Cir. 5/23/18), 247 So.3d 1137, writ denied , 18-1067 (La. 11/05/18), 255 So.3d 1053 ; State v. Thomas , 51,346 (La. App. 2 Cir. 6/21/17), 223 So.3d 759, writ denied , 17-1264 (La. 3/9/18), 237 So.3d 523 ; State v. Harris , 44,402 (La. App. 2 Cir. 6/24/09), 20 So.3d 1121, writ denied , 09-2303 (La. 4/23/10), 34 So.3d 271. Additionally, the court has discretion to grant a timely filed motion for a continuance "in any case if there is good ground therefor." La. C. Cr. P. art. 712. Because the decision to grant or deny a motion for continuance rests within the sound discretion of the trial court, a reviewing court will not disturb the trial court's determination absent a clear abuse of discretion. State v. Saulsberry, supra ; State v. Thomas, supra ; State v. Free , 48,260 (La. App. 2 Cir. 11/20/13), 127 So.3d 956, writ denied , 13-2978 (La. 5/30/14), 140 So.3d 1174. Generally, a reviewing court will not reverse a conviction even on a showing of an improper denial of a motion for a continuance, absent a showing of specific prejudice. State v. Manning , 03-1982 (La. 10/19/04), 885 So.2d 1044, cert. denied , 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005) ; State v. Saulsberry, supra ; State v. Free, supra .
Courts generally take into consideration the length of time the matter has been pending and, if there is new counsel, the amount of time that has passed since the appointment or retaining of that counsel. See State v. Tate , 38,576 (La. App. 2 Cir. 8/18/04), 880 So.2d 255, writ denied , 04-2554 (La. 1/14/05), 889 So.2d 268 ; State v. Simmons , 13-258 (La. App. 5 Cir. 2/26/14), 136 So.3d 358, writ denied , 14-0674 (La. 10/31/14), 152 So.3d 151.
The denial of motion for a continuance on grounds of counsel's lack of preparedness does not warrant a reversal unless counsel demonstrates specific prejudice resulting from the denial, or the preparation time is so minimal as to call *705 into question the basic fairness of the proceeding. State v. Jordan , 50,002 (La. App. 2 Cir. 8/12/15), 174 So.3d 1259, writ denied , 15-1703 (La. 10/10/16), 207 So.3d 408, citing State v. Snyder , 98-1078 (La. 4/14/99), 750 So.2d 832.
The trial court did not abuse its discretion in denying the motion to continue. The record shows that the trial court thoroughly and thoughtfully considered the defense's motion and was not persuaded that there were good grounds for continuing the trial. Further, there was no showing of any prejudice resulting from the denial of the motion. As the state points out, the matter has been pending for more than two years and the state had long since complied with the defense's discovery requests, including the statements of the witnesses Brown now claims have not been interviewed.
Understandably, appointed counsel partially relied upon the IDB investigator to assist in preparing Brown's defense. However, once Hudson fell ill, Brown's counsel didn't request the assistance of another investigator. It is defense counsel's duty to his client to prepare his case for trial and, in this matter, counsel (who represented Brown from arraignment through trial) had more than adequate time to prepare and ensure that Brown's case was thoroughly investigated and prepared by the time of trial in February 2018.
The evidence presented at trial was overwhelming, and the defense was aware of, and in fact possessed, the statements of the state's witnesses well in advance of trial. The exception is Rosemary Cleveland, whose identity was included in the supplemental article 768 notice. Even if the court were to find that this was a last-minute disclosure and that the denial of the motion to continue was improper, the evidence of guilt is overwhelming even without Rosemary Cleveland's testimony. There simply has been no showing of specific prejudice by the defense. State v. Manning, supra ; State v. Saulsberry, supra ; State v. Free, supra .
On the record, we cannot say that the trial court abused its sound discretion by denying defense counsel's motion to continue. Brown has failed to make a showing of specific prejudice to warrant reversal of his convictions.
We have found an error patent. On the conviction for possession of a firearm by a convicted felon, the trial court imposed a sentence of ten years at hard labor. At the time of the offense, September 28, 2015, La. R.S. 14:95.1 provided that whoever was found guilty of possession of a firearm by a convicted felon shall be imprisoned at hard labor for not less than 10, nor more than 20 years without the benefit of probation, parole, or suspension of sentence and be fined not less than $1,000, nor more than $5,000.[6] Because Brown's sentence was imposed without denial of the benefit of parole, probation, or suspension of sentence restrictions or the mandatory fine, it is illegally lenient. When a district court fails to order that a sentence should be served without benefit of parole, probation, or suspension of sentence as mandated by statute, those required restrictions are self-activating and there is no need to remand for correction of an illegally lenient sentence. La. R.S. 15:301.1(A) ; State v. Williams , 00-1725 (La. 11/28/01), 800 So.2d 790 ; State v. Hanks , 46,110 (La. App. 2 Cir. 030/9/11), 58 So.3d 1093 ; State v. Sudds , 43,689 (La. App. 2 Cir. 12/3/08), 998 So.2d 851, writ *706 denied , 09-0154 (La. 10/16/09), 19 So.3d 472. Regarding the failure to impose the mandatory fine, the state did not object to the error, and Brown obviously is not prejudiced by the trial court's failure to impose the mandatory fine. Accordingly, this Court will not remand the case for correction of the sentence to include such a fine. State v. Reynolds , 49,258 (La. App. 2 Cir. 10/1/14), 149 So.3d 471.
CONCLUSION
For the reasons set forth above, the convictions and sentences of defendant, Larry R. Brown, Jr., are affirmed.
AFFIRMED.

During argument on the motion to continue, the district attorney stated that the motion for speedy trial was called for hearing, and Brown represented to the court that he wanted to proceed to trial. However, defense counsel convinced Brown to "back off" of that motion and there was no ruling thereon.

Appeals were taken in both lower court docket numbers and this Court dismissed the appeal in the initial docket number charging Brown with only possession of a firearm by a convicted felon and made that record an exhibit to the instant appeal.

La. C. Cr. P. art. 768, Same; use of confession or inculpatory statement; notice to defendant prior to opening statement, provides:
Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.

Dr. Frank Paretti, a forensic pathologist, testified that there were 16 entrance wounds and multiple exit wounds in the victim's body. He also pointed out that the victim had shrapnel wounds caused from bullets that hit the ground and fragmented.

Buck was Mary Miles' husband; he was deceased at the time of the shooting.

Effective July 31, 2017, the minimum sentence was changed to five years.