LOLLEY, J.
|2This criminal appeal arises from the First Judicial District Court, Parish of Caddo, State of Louisiana. The defendant, Broderick Jerome Brooks, Jr., was convicted by a jury of second degree murder, a violation of La. R.S. 14:30.1. He was subsequently sentenced to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence, which conviction and sentence Brooks appeals. For the following reasons, we affirm the defendant’s conviction and sentence.
Facts
Broderick Brooks was a young man with a promising future in collegiate sports. However, as the facts of this case show, bad choices by Brooks led to unfortunate consequences — death for one individual and a life sentence in prison for another. Two lives, irreversibly marred by an act of senseless violence.
Brooks was arrested and charged by bill of information with the second degree murder of Donte Gilbert, who was killed during the commission of a drive-by shooting in Shreveport, Louisiana, during the early morning hours of August 9, 2008. Brooks was tried before a jury, and during the trial the following evidence was adduced.
At around 3:00 a.m. on August 9, 2008, members of the Shreveport Police Department responded to the call of a shooting on the 600 block of Springhill Street in Shreveport. The first officer on the scene, Corporal M. Jones, testified that when he arrived he saw a black male, subsequently identified as Kentrell Turner, standing on the side of the residence located at 643 Springhill Street. The house was located on the right of the street as Jones entered the block from Louisiana Avenue. The house was preceded by a wooded area and followed by a vacant lot. Turner was standing over the body of Donte Gilbert and yelling that he had been shot. Gilbert was not conscious and after members of the fire department arrived, he was transported to a hospital where he subsequently died. Gilbert’s autopsy indicated his cause of death to be a gunshot wound which entered his left flank, pierced the lower lobe of his left lung and exited through Gilbert’s back just to the right of his spine.
|sSubsequent interviews with Kentrell Turner and a neighbor, Shakeya Johnson, led officers to 11 different suspects, including the defendant. Among the other 10 suspects were Bobby Mosley, Norman Frazier, and Corey Roberson, all of whom testified at trial.
According to Bobby Mosley, the defendant, whom he had known since both attended Booker T. Washington High School, called him on August 8, 2008, and told Mosley to come to Shakeya Johnson’s home, whom Mosley identified as the defendant’s girlfriend. When Mosley arrived, there was a birthday party going on for Shakeya’s daughter. Mosley testified that at that party the defendant was upset because Keithric Marshall had pulled a gun on him earlier. Mosley explained that later that same day, he picked up the defendant and they went to a party at the Municipal Auditorium. Once there, they met up with Corey Roberson, Furlando Washington, Norman Frazier, Dardanius “Bam” Clark, Garret Watson, Brandon Howard, Devine Jones, Romedro Dem-ming, and Larry Norwood. Mosley de *509 scribed that Corey Roberson was driving a black Equinox.
Mosley testified that when the group left the Municipal Auditorium they went to a house on Looney Street where the defendant retrieved a .45-caliber Hi-Point firearm. From there they went to Mosley’s cousin’s house where Mosley dropped off his cousin’s vehicle. Mosley and the defendant joined Roberson and Washington in the black Equinox. They then traveled to the “Scene,” a nickname used for the area at the intersection of Jewella and Greenwood Road where people tended to congregate. Joining them at the “Scene” were Frazier, Clark, Watson, Howard, Jones, Demming, and Norwood.
Frazier and Clark were in a black Ford Explorer and Clark was carrying a .40-caliber firearm under his shirt. Watson and Howard followed in a tan Crown Victoria, and Norwood, Jones and Demming followed in a gray Crown Victoria. Mosley testified that while in a McDonald’s parking lot, the defendant told Mosely, Washington and Roberson about being “pissed off’ over the situation with Marshall. Mosley could not say whether the defendant spoke to anyone else about it because they were not together the entire time in the parking lot.
LFrazier testified that while in the McDonald’s parking lot, the defendant told them about having a gun pulled on him by a “short fat dude,” (presumably Marshall). Frazier stated that the defendant was mad about it and wanted to shoot up the “short fat dude’s” car to scare him. Roberson denied hearing the defendant talking about the Marshall incident, but claimed he had not stayed with the group in the parking lot, choosing instead to go speak to a female friend.
According to Frazier, from McDonald’s all four cars drove in a caravan to Shake-ya’s home so that the defendant could retrieve a cellphone charger. The defendant, Washington and Mosley were riding as passengers in Roberson’s vehicle, which was in the lead. Frazier’s vehicle followed immediately behind, and the two other cars were behind Frazier.
When they arrived, Mosley and the defendant got out of the black Equinox and went to Shakeya’s front door. As the defendant returned, Frazier testified that the defendant instructed everyone to turn off their headlights and he pointed out Marshall’s car. Mosley recalled the defendant telling them to “get the car,” and Roberson heard the defendant tell everyone to “lock and load.”
Roberson’s car pulled away from Shake-ya’s home with the defendant sitting in the rear passenger-side seat. As they approached 643 Springhill Street, Mosley indicated that the defendant, who was now sitting in the rear driver-side seat, leaned in front of him and fired several shots with his .45-caliber Hi-Point firearm out of the partially opened driver-side rear window. Frazier, following behind, corroborated that the first shots were fired from Roberson’s vehicle out of the driver-side window and the moon roof. Roberson’s vehicle slowed in front of 648 Springhill Street as the shots were fired and then drove off and turned onto Louisiana Avenue. Gunshots were also fired from Frazier’s vehicle and, according to Frazier’s perspective, from at least one of the vehicles behind him.
Their next stop was the defendant’s aunt’s home, where Frazier testified that the defendant provided Jones with additional bullets. While they were gathered there, Frazier saw the different weapons everyone had. He confirmed the defendant’s weapon as a .45-caliber firearm and Clark’s as a .40-caliber firearm. He claimed Mosley and Washington both had *510 .380-|caliber5 firearms, Howard had a 9-mm firearm, Jones had a .45-caliber firearm and Demming had a 9-mm rifle.
Jerry Bryant also testified at the trial. Bryant was the victim’s cousin and was on the porch of 643 Springhill Street the night of the shooting. According to Bryant, several people, including Gilbert, were on the porch drinking in the early morning hours of April 9th. He was there when “the commotion started,” or as he further described, “a bunch of gunfire and stuff.” Bryant was sitting next to Gilbert in chairs near the edge of the porch. He described how he and Gilbert ran toward the back of the house when the shooting began. However, Bryant quickly noticed that he had been shot in his back and that his cousin, Gilbert, was on the ground bleeding.
Recordings of statements made by the defendant in post-arrest interviews were also admitted into evidence and played for the jury. During the first of the two interviews, the defendant admitted that on August 8, 2008, while attending a birthday party at Shakeya’s home, he had an altercation with someone he identified as “Keith.” He also admitted that later that evening he had returned to his girlfriend’s home to pick up a cellphone charger and was accompanied by his “boys” traveling in at least three separate vehicles. Defendant had asked them to go with him because the “dude” had threatened him. After getting his charger, the defendant claimed that he heard a gunshot. In response, the defendant’s party drove off and as they did so occupants of the vehicles behind the one defendant was traveling in returned fire. Later during the interview, defendant admitted that he too had been shooting a .45-caliber firearm, but stated unequivocally that he was only shooting at the car.
In a second interview conducted two days later, the defendant altered his version of the events and admitted that he had told the others about his altercation with “Keith” while in a parking lot of the “club” and told them to go “over there” with him. When asked specifically what he had said to them, defendant replied:
Nothing but dude had threatened my life over there by my girlfriend’s house, just pulled a gun on me and threatened me. So let’s go by there and see if they over there.
_[gAfter arriving on Springhill Street, Brooks described the following events:
Once we got over there, when we got over there, we stopped. B.J. ran in there to get the car, I mean the phone charger. I got out and said “it’s the blue Chevy,” you know what I’m saying. Like that’s the main thing I said “it’s the blue Chevy.” So because I wasn’t trying, I ain’t go over there with the intention of killing nothing, just go over there to scare them, you know what I’m saying. So knowing everybody in the Chevy, so I told you know, shoot at the Chevy so we start shooting at the Chevy and then they was still on the porch until the cars behind us passed on through and we saw them running and diving on the ground. Like “what, what /all shooting at? I told y’all shoot at the Chevy.” They was like “just shooting,” you know what I’m saying.
As the defendant’s recorded statement continued, when they arrived at Shakeya’s home, defendant saw Marshall on the porch, presumably of the 643 Springhill Street residence. Defendant pointed out Marshall’s Chevy Caprice in front of the residence and instructed the others in his party to “just shoot at the car.” Asked specifically who in the rear vehicles he had instructed to shoot, he said he had told “Bam” (i.e., Clark) to shoot at the car. The *511 vehicles then all drove in front of 643 Springhill Street shooting their weapons in the general direction of the residence. Defendant insisted that he and the occupants of the vehicle he was in were shooting at the Chevrolet Caprice, but that he did not know where the occupants of the following vehicles were shooting. They pulled over down the street and the defendant asked the others where they had been shooting. When they said they were “just shooting,” the defendant told them, “Man that’s stupid, bro,” since he had specifically told them to shoot at the car. While defendant was vague as to the names of the occupants of the following vehicles, he admitted to knowing that Clark, Washington, Mosley, Roberson, Frazier and Howard were among them. While defendant became aware that Dem-ming was also in one of the cars, defendant stated he did not know Demming was there before the drive-by shooting took place.
During the initial investigation of the shooting, law enforcement located numerous spent shell casings in the roadway of Springhill Street. Officers did not locate any shell casings either on or in the immediate 17vicinity of the porch of 648 Spring-hill Street. They did discover numerous bullet holes in the facade of the residence.
Further investigation by crime scene investigators yielded nine .45-caliber shell casings, one live .45-caliber round and two .380-caliber shell casings located in or just next to the roadway and no shell casings on the front porch or around the residence. Various bullet holes were also located on the front of the residence and on the side facing away from Louisiana Street. Two fired projectiles were found on the front porch. Two spent projectiles and five potential damage sites where projectiles had struck were found inside the home. Additionally, one projectile was found embedded in the door frame and another was lying on the ground between the outer and interior panels of the wall. Keithric Marshall’s Chevrolet Caprice was recovered from Christus Schumpert Hospital. It had a bullet hole in the rear quarter panel and a .45-caliber spent projectile was found in the trunk.
Investigators impounded a black Equinox belonging to Corey Roberson’s mother and found two shell casings inside, one on the driver’s side floorboard and the other on the front passenger’s side floor board. Both shell casings were .380-caliber. Three other vehicles were also impounded: a black Ford Explorer, a tan Crown Victoria and a gray Crown Victoria. The black Ford Explorer, which had been driven by Norman Frazier on the night of the shooting, had two bullet holes in the hood of the vehicle. The radiator to the vehicle had been removed from the engine bay and was found in the rear hatch of the SUV. The radiator had a bullet hole through it. Corporal Armstrong found no other potential gunfire damage to the vehicle. Examination of both Crown Victoria vehicles yielded no evidence that either vehicle had suffered any gunfire damage.
Ballistics testing determined that the projectile found in the trunk of Keithric Marshall’s car had been fired from the .45-caliber Hi-Point firearm identified by Bobby Mosley as the gun the defendant was carrying on the night of Donte Gilbert’s murder. The various suspects also led investigators to a 9-mm rifle and a .45-caliber Ruger firearm. Reference bullets from both of these firearms were determined to have similar characteristics to spent projectiles recovered from the scene. In the case of the Ruger, the 18similarities were sufficient for positive identification of the weapon as a source of the shots. In the case of the 9-mm rifle, the similarities *512 were sufficient enough to prohibit its exclusion as a source of some of the shots.
Brooks took the stand in his defense and admitted that he and Marshall had argued; however, he claimed that Marshall had refused to fight him and then brandished a gun. As to his inculpatory statements made to police, the defendant recanted them. He stated that at the time they were made he was overwhelmed and scared, because he was being charged with murder. In his trial version of the events of August 9, 2008, defendant again claimed that he heard a shot as he returned to Roberson’s vehicle from the porch of Shakeya’s house. Although he did not know where it had come from, defendant decided after getting in the vehicle to shoot at Keithric Marshall’s car as they drove away. He testified that he did not know who was in the vehicles behind him or whether any of them had a weapon before the shooting. He also stated that he did not instruct anyone else to shoot, and never had a conversation with anyone afterward about what they were shooting with or at. In an attempt to explain his knowing the names of the occupants of the other vehicles during his August 11, 2008, statement to police, he indicated that he had been in jail for several days and had been able to “find out the names exact.” He did not indicate how or from whom he obtained the information.
After considering the evidence and testimony, the jury returned a verdict of guilty as charged of second degree murder. Post-trial motions for new trial and post-verdict judgment of acquittal were both denied. After defendant waived the sentencing delays, the trial court imposed the mandatory sentence of life imprisonment without the benefit of parole, probation or suspension of sentence. The instant appeal followed.
DisCussion

Sufficiency of the Evidence

In his first assignment of error, Brooks argues that there was insufficient evidence against him to support a conviction for second degree murder. Specifically, Brooks claims that the state failed to prove that he was involved in a drive-by shooting because he simply fired his gun in reaction to hearing a shot and, therefore, did not have the necessary intent to either | nkill, harm or frighten another person as required for the perpetration of a drive-by shooting. Primarily, Brooks points to allegedly contradictory testimony of all the participants as to the series of events leading up to the shooting, and the state’s failure to prove which bullet killed Donte Gilbert.
As stated in La. R.S. 14:30.1, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of ... assault by drive-by shooting, ... even though he has no intent to kill or to inflict great bodily harm.
A “drive-by shooting” means the discharge of a firearm from a motor vehicle on a public street or highway with the intent either to kill, cause harm to, or frighten another person. La. R.S. 14:37.1.
Regarding principals, La. R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirect *513 ly counsel or procure another to commit the crime, are principals.
A defendant who is a principal in a drive-by shooting can be convicted of second degree felony murder even though the fatal shot was fired by a companion acting in concert with the defendant in the commission of the shooting. State v. Stewart, 48,149 (La.App.2d Cir.05/07/08), 982 So.2d 353, writ denied, 2008-1343 (La.03/06/09), 3 So.3d 480.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.01/09/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. 11flart. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.02/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.01/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/06/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 1994-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gamer, 45,474 (La.App.2d Cir.08/18/10), 47 So.3d 584.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La. App.2d Cir.01/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/06/09), 21 So.3d 299.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra.
This includes the testimony of accomplices. An accomplice is a competent witness to testify against his co-perpetrator even if the prosecution offers him inducements to testify; these inducements weigh on the witness’s credibility. State v. Jetton, 32,893 (La.App.2d Cir.04/05/00), 756 So.2d 1206, writ denied, 2000-1568 (La.03/16/01), 787 So.2d 299. The credibility of an accomplice’s testimony is not within the province of the court of appeal to decide. Id. Rather, credibility evaluations are within the province of the trier of fact. Id. The fact finder is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that Indiscretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 1999-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
*514 Here, the state presented ample evidence, some in the way of defendant’s own statements to police, that: he and Keithrie Marshall had an altercation on August 8, 2008; defendant was angry about the altercation; and, he had communicated this anger to some and perhaps all of the individuals that went with him to Springhill Street in the early morning hours of August 9, 2008. He also communicated his desire to scare Marshall by shooting up his car. After he stopped at Shakeya’s house to pick up defendant’s cellphone charger, multiple witnesses testified that the defendant pointed out the vehicle at which the participants were to shoot. The defendant and his acquaintances then drove by 643 Springhill Street where Donte Gilbert was sitting with Keithrie Marshall, Kentrell Turner and Jerry Bryant. As they passed, the occupants of the vehicles, including the defendant, fired a barrage of bullets, one of which struck Donte Gilbert and ultimately caused his death.
In claiming that there was a lack of evidence that he had recruited anyone to participate in the shooting, Brooks misrepresents the record. He characterizes Roberson’s testimony as affirmatively declaring that defendant made no mention of his altercation with Marshall before the shooting. Similarly, he states that Mosley testified that the “only people” the defendant talked to about the altercation were the four individuals riding with him in the black Equinox. A reading of the testimony, however, does not support defendant’s representation. Roberson testified that he did not hear defendant say anything, but noted that he had not remained with the group while they were at McDonald’s. Mosley testified that he did not recall defendant telling anyone other than the aforementioned group, but that he too had split from the group while in the McDonald’s parking lot. Finally, while Brooks testified at trial that he had no recollection of saying anything to anyone, the jury had already heard his taped statement with police in which he admitted telling his friends that Marshall had threatened his life and that he asked them to go with him so they could find Marshall.
112Likewise, Brooks points to various discrepancies in the different witnesses’ testimony as to what he said just prior to the shooting. Brooks maintains that his trial testimony reflected that he said nothing and merely fired his gun as a reaction to hearing a shot. Even if Brooks’ own admission to police that he told his friends and at least one individual (Clark) in a following vehicle to shoot is disregarded, the discrepancies in the other witnesses’ testimony were not irreconcilably inconsistent. As noted earlier, the fact that some witnesses did not hear the defendant say certain things is not the equivalent of proof that he did not say them. The discrepancies only indicate that 11 individuals spread throughout four different vehicles did not hear with accuracy what the defendant said to them as he walked back to the vehicle from Shakeya’s house.
The record contains more than sufficient evidence to support the conviction of second degree murder, particularly when viewed in the light most favorable to the state as required by the Jackson standard. This assignment is therefore without merit.

Evidence of Other Crimes

In his second assignment of error, Brooks argues that the trial court erred in permitting the introduction of “404(B)” evidence that was not relevant to the crime for which he was on trial, had little if any probative value and was prejudicial to him. Specifically, Brooks argues that the trial court erred in allowing the state to present evidence of his alleged involvement in the shooting(s) that took place elsewhere after *515 the Springhill Street drive-by shooting. Defendant argues that the evidence had limited probative value which was greatly outweighed by its prejudicial effect. We disagree.
Louisiana C.E. art. 404(B)(1) regarding the introduction of evidence of a defendant’s other crimes, wrongs, or acts provides:
(1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided |1sthat upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Generally, evidence of other acts of misconduct is not admissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes him or her as a “bad person.” La. C.E. art. 404(B)(1); State v. Jackson, 625 So.2d 146 (La.1993). This rule of exclusion stems from the “substantial risk of grave prejudice to the defendant” from the introduction of evidence regarding his unrelated criminal acts. State v. Prieur, 277 So.2d 126 (La.1973). However, evidence of other crimes may be admissible if the state establishes an independent and relevant reason, ie., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404(B)(1); State v. Roberson, 40,809 (La.App.2d Cir.04/19/06), 929 So.2d 789. Even when the other crimes evidence is offered for a purpose allowed under Article 404, the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defense. The probative value of the extraneous crimes evidence must outweigh its prejudicial effect. La. C.E. art. 403; State v. Jacobs, 1999-0991 (La.05/15/01), 803 So.2d 933, cert. denied, 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002); State v. Hatcher, 372 So.2d 1024 (La.1979.)
A trial court’s ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. State v. Scales, 1993-2003 (La.05/22/95), 655 So.2d 1326, cert, denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996); State' v. Caston, 43,565 (La.App.2d Cir.09/24/08), 996 So.2d 480; State v. Cooks, 36,613 (La.App.2d Cir.12/04/02), 833 So.2d 1034.
For evidence of other crimes to be admissible, the state must: 1) prove with clear and convincing evidence that the other acts or crimes occurred |Mand were committed by the defendant; 2) demonstrate that the other acts satisfy one of the requirements of La. C.E. art. 404(B)(1), i.e., motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident; and, 3) show that the probative value of the evidence outweighs its prejudicial effect. State v. Jackson, 625 So.2d at 149.
The erroneous introduction of other crimes evidence is subject to harmless error review. State v. Roberson, supra. Harmless error analysis begins with the premise that the evidence is otherwise suf- *516 fícient to sustain the conviction if viewed from the perspective of a rational factfin-der and asks whether beyond a reasonable doubt the error could not have contributed to the verdict actually returned by the defendant’s jury. State v. Haddad, 1999-1272 (La.02/29/00), 767 So.2d 682, cert. denied, 531 U.S. 1070, 121 S.Ct. 757, 148 L.Ed.2d 660 (2001). The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
Here, the state showed by clear and convincing evidence that Brooks committed the proffered acts. Furthermore, part of Brooks’ trial strategy was to establish his minimal or nonexistent familiarity with the majority of the alleged participants in the shooting at Springhill Street. Brooks also testified at trial, as he had in his initial statement to police, that he thought he had been fired upon as he was returning to Roberson’s car. Accordingly, the evidence that the men were fired upon later in the evening and that those shots struck Norman Frazier’s vehicle, the only vehicle with any bullet damage, was relevant to rebutting the defense that the occupants of the porch at 643 Springhill Street had initiated the shooting. By explaining that the only gunfire damage to the subject vehicles had come from an incident unrelated to the shooting on Springhill Street, the state eliminated the only possible physical evidence which might have supported Brooks’ claim.
The relevance and probative value is not quite as clear regarding the evidence that Brooks and others in the various vehicles returned fire. The state argues that the evidence tends to show, contrary to the defendant’s claim, that he was acting in concert with the occupants of the other vehicles [1ñdespite their loose affiliation. While the evidence that he remained with the individuals after they had, without solicitation, spontaneously shot up a house while “following” him, showed a closer affiliation than Brooks admitted to on the stand, the evidence of his returning fire in the subsequent incident tended to show that the participants’ actions were not planned and were merely a reaction to being fired upon. The evidence did not tend to rebut Brooks’ theory of the case. If anything, it corroborated his allegation that when fired upon his impulse was to shoot back.
This error was, however, harmless. The evidence against Brooks has been discussed herein. Brooks admitted to all the necessary elements of second degree murder in his statement to police. The evidence was corroborated by the testimony of three of the co-conspirators and by physical evidence adduced by the police investigation. Considering the strength of this evidence against Brooks, it would be difficult to conclude that the jury verdict was attributable to the possible error of admitting Brooks’ involvement in the subsequent shootings into evidence. We conclude that this assignment is without merit.
Conclusion
For the foregoing reasons, the conviction and sentence of Broderick Jerome Brooks Jr. are affirmed.
AFFIRMED.