STEWART, J.
hThe defendant, Samuel Jordan, was found guilty of the first degree murder of L.K., his infant daughter. Because the jury was unable to reach a decision regarding the imposition of the death penalty, Jordan received the mandatory sentence of life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. Jordan now appeals his conviction on the grounds that he was prejudiced by the state’s introduction of evidence of prior bad acts, that the trial court erred in denying his motion to suppress statements he made to law enforcement officers, and that the trial court erred in denying a continuance. Finding no reversible error, we affirm Jordan’s conviction and life sentence.
FACTS and PROCEDURAL HISTORY
L.K. was born to Antoinette Kennedy and Jordan, an unmarried couple, on October 30, 2008. Jordan had the infant in his care for a week prior to Christmas. On December 23, 2008, the fire department responded to a call from Laquita Griffin, Jordan’s neighbor, reporting an infant in respiratory distress. L.K., age eight weeks, was unresponsive and breathing only three respirations per minute. The paramedic described it as agonal breathing.
The emergency room physician, Michael Sullivan, observed that the infant was limp, not moving, and had bruising over her entire face. Tests confirmed that L.K. had massive swelling of the brain and bleeding in her skull and brain. She was intubated and placed on a ventilator. The record contains excruciating and detailed evidence of L.K’s traumatic head injuries and suffering. After further testing at a pediatric intensive care unit |2at another hospital, doctors determined that the infant’s condition was irreversible. She was brain dead. On December 29, 2008, Kennedy gave permission for L.K. to be removed from the ventilator, and L.K’s short life came to an end as a result of blunt force closed head injuries.
On March 20, 2009, a grand jury indicted Jordan, age 21, for the first degree murder of L.K. Jordan entered a plea of not guilty at a formal arraignment on March 24, 2009. On August 18, 2009, the state filed a notice of intent to seek the death penalty.
On October 27, 2009, Jordan filed a motion to suppress recorded statements he made to Shreveport Police Department (“SPD”) officers on December 23 and 29, 2008. At the hearing on February 22, 2010, Jordan made an oral motion to in- *1263 elude an unrecorded statement he made to an officer on December 23, 2008, while being transported from the hospital to SPD. After the testimony of the officers and arguments by counsel, the trial court denied the motion to suppress Jordan’s recorded and unrecorded statements.
On July 20, 2010, 'the state gave notice of its intent to introduce other crimes evidence, namely, Jordan’s prior conviction for cruelty to a juvenile, for purposes of proving intent and absence of mistake. Jordan requested a hearing to determine the admissibility of the other crimes evidence under La. C.E. art. 404(B). The hearing took place on August 18, 2010, at which time the trial court ruled the evidence admissible. Due to Jordan’s vulgar" outbursts during this hearing, the trial court held him in contempt and imposed a sentence of six months in the parish jail.
IsAfter at least two previous trial settings were upset, the defendant’s trial was again set for July 23, 2012. On April 11, 2012, defense counsel filed a motion for a continuance on the grounds that the mitigation investigation was not complete and would not be complete by the trial date. Defense counsel asserted that if the trial date was not continued, he would be unable to provide effective representation. An amendment to the motion was filed on April 19, 2012. After arguments on April 11 and 19, 2012, the trial court denied the motion. On May 81, 2012, this court denied the defendant’s application for supervisory review. The supreme court then denied the defendant’s writ as untimely on July 6, 2012.
On July 10, 2012, two additional attorneys enrolled as counsel for Jordan, affording him the benefit of representation by three capital-qualified defenders. On July 13, 2012, the defense filed notice of its intent to introduce evidence of Jordan’s mental condition at trial. Then, on July 16, 2012, the defense filed another motion to continue and motions to withdraw from representation, asserting that their continued representation of Jordan would violate the Rules of Professional Conduct because they would be unable to provide him competent representation. Again, the defense claimed that its mitigation investigation was incomplete. After hearing arguments on July 18, 2012, the trial court denied the motions to continue and to withdraw.
July selection began on July 23, 2012. During jury selection, there were more arguments pertaining to the defense’s efforts to continue the trial, culminating with the defense again filing motions to withdraw and a motion |4for a mistrial on July 27, 2012. After arguments, the trial court denied these motions, and opening statements were made to the empaneled jury.
At the close of the state’s case on July 28, 2012, the defendant elected not to testify. After deliberating for two hours, the jury returned a unanimous verdict of guilty as charged of the first degree murder of L.K
The sentencing hearing took place from July 29 through August 1, 2012. After deliberating 3½ hours, the jury foreman reported to the court that the jury was hopelessly deadlocked. The trial court declared a hung jury as to sentencing. On August 7, 2012, after denying the defendant’s motion for judgment of modification of the verdict, the trial court sentenced Jordan to life imprisonment without benefit of probation, parole, or suspension of sentence as mandated by La. C. Cr. P. art. 905.8.
On December 30, 2013, Jordan filed an application for post conviction relief seeking an out-of-time appeal, which the trial court granted. In three assignments of error, Jordan asserts that the trial court erred in denying his motions to suppress *1264 ' his statements, that he was prejudiced by the improper introduction of evidence of prior bad' acts, and that the trial court erred in denying the motions to continue the July 23, 2012, trial setting.
DISCUSSION

Motion to Suppress

On October 27, 2009, Jordan filed a motion to suppress audio recorded statements he gave on December 23 and 29, 2008, to Detective Rod Demery (“Demery”) of the SPD. He orally amended his motion and 1 Jater filed a written motion to suppress an unrecorded statement he made to Corporal Henry Burak (“Burak”), who transported him from the hqspital to SPD offices on December 23, 2008. The motion to suppress alleged that Jordan made the statements
under the influence of fear, duress, intimidation, menaces, threats, inducements and/or promises, and/or without defendant having been properly advised of his rights to remain silent and to have counsel appointed to represent him and/or without a sufficient understanding of his rights in order to make an intelligent waiver of those rights.
At the February 22, 2010, hearing on the motion to suppress, three SPD officers testified. • Burak and Demery responded to the hospital, Willis-Knighton South, about a “welfare concern” involving an infant. Dr. Sullivan informed them of L.K’s condition and his concern that she had been beaten. Burak testified that he was present when Dr. Sullivan informed the defendant and L.K.’s mother that the child would likely not survive. He stated that the defendant dropped his head but exhibited no real emotional response.
After Jordan agreed to speak with officers, Burak transported him to the police station. Jordan was not under' arrest and was not handcuffed. Burak stated that Jordan did not appear to be under the influence of alcohol or other substances and was very relaxed during the ride. According to Burak, Jordan made a spontaneous statement to him. Jordan stated that he had dropped L.K. earlier that day but had not wanted to tell the mother.
Demery and' Detective Shawn Hinder-berger (“Hinderberger”) participated in the recorded interview of Jordan on December 23, 2009. The officers told Jordan that because the baby’s prognosis was death, they [ riwere investigating him for first degree murder and that the penalty for that offense was death or life imprisonment.' Hinderberger and Demery‘testified that Jordan was not handcuffed or restrained in any way, that he did not appear sick, did not ask for food or water, and made no complaints. After Demery read Jordan his rights, Jordan said he understood his rights,’waived them, and agreed to give them a recorded statement. The officers testified that no threats, promises, or inducements were presented to Jordan and that Jordan never asked for a lawyer. Jordan appeared to understand the questions asked during the interview, and he answered appropriately. Though Jordan did appear nervous, he was coherent and not evasive. • Both officers stated that Jordan did not appear to have any mental impairment.
In the audio recorded statement, Jordan told Demery and Hinderberger that he and the baby’s mother, Kennedy, did not live together. Jordan stated that he had L.K. with him for about a week and that she had been crying uncontrollably. He admitted that the noise bothered him and that he became frustrated with the baby’s crying. He tried to stop the crying by playing with L.K. and tossing her in the air. He admitted that he played too rough with her and that he accidentally dropped *1265 her by failing to catch her when he threw her in the air. He stated that she hit her head on her car seat. Afterward, he noticed that her breathing had changed. When she began appearing sluggish, he slapped her several times to awaken her. Finally, he took her to a friend’s house, where he was advised to call 911. Jordan explained that he hesitated because he thought Kennedy would be mad and because he did not have the baby’s information.
17Pemery testified that Jordan exhibited no remorse and did not ask about L.K’s condition. At the end of the interview, they arrested Jordan for second degree battery because L.K. was still alive.
Demery testified that he was at the city jail for other matters on December 29, 2008, when Jordan called to him and indicated that he wished to speak with him again. Demery and Detective Craig Ivey conducted the second recorded interview with Jordan, who was again Mimndized and who again waived his rights. Demery told Jordan that L.K. had died, and that he was being charged with first degree murder, for which the death penalty could be sought. Jordan indicated his understanding and did not request a lawyer. Demery testified that, except when talking about L.K.’s mother, Jordan was cooperative, respectful, and calm throughout the interview.
During the interview, Jordan stated that he had friends at his house on the Sunday night[1] and that they had been using cocaine and weed, as well as drinking. He indicated that things went downhill after that time. Jordan again admitted that he was frustrated by L.K.’s crying, and he admitted that he beat her. He stated, “I picked her up, threw her in her car seat about three times. I hit her upside her head maybe like four or five times.” He indicated that he hit her with a partially closed hand. He stated that the infant cried even more, so he shook her until she “kind of just shut up.”
Jordan stated that from Monday night until Tuesday morning, L.K. would not “shut up.” He described in horrifying detail the actions' he took to quiet the infant:
|s[S]o I shook her until hell’s bound through that night, just shook her, shook her, shook her, shook her. I hit her a couple of more times to make her shut up and that Tuesday morning she really wouldn’t shut up. So I hit her again. That’s when she just kind of just you know fell out, out of it and then went to breathing funny[.]
Jordan told Demery that he finally went to a neighbor’s house with the baby and claimed that she was sick.[2] He stated that she began coughing up some yellow substance in addition to “breathing funny.” When Jordan did not call for help, the neighbor did so.
Jordan told the detectives that he acted in frustration and did not intend to kill his baby. He just wanted to “get rid of the noise.” When asked what he thought would happen to the baby as a result of his hitting her and throwing her, he stated “really just nothing.” Jordan talked about problems he had with Kennedy and her, new boyfriend, and he complained that she had told him that L.K. was not his child. He said that he always knew he would end up in jail, but not for murdering his own baby. Jordan further stated that when L.K. was brought to the hospital, he knew the police would figure out that he had beat her and that they would believe he *1266 did it intentionally and was trying to cover it up. Before the interview ended, Jordan told Demery that he hit L.K. over 15 times, but he insisted that his actions were not intentional. He said that someone told him to tell the police that he did not act intentionally because “nine times out of ten you can get a lesser charge.”
Jordan did not testify or present any evidence in support of his motion to suppress.
|nThe trial court found that Jordan had been properly advised of his rights prior to each recorded interview, that he knowingly and intelligently waived his rights, and that he freely and voluntarily gave statements to the police. Thus, the motion to suppress the defendant’s statements was denied.
Appellate counsel argues that Jordan’s low IQ prevented him from knowingly and intelligently waiving his Miranda rights and making free and voluntary statements to the police. Referring to Jordan’s behavior and the fact that he was held in contempt of court, counsel asserts that Jordan “has issues with his mental capacity and understanding of the impropriety and consequences of his conduct.” For these reasons, appellate counsel argues that the trial court erred in denying the motion to suppress.
Referring to the officers’ testimony at the motion to suppress hearing, the state asserts that it proved that Jordan was advised of his rights and never indicated that he did not understand them. The state asserts that Jordan was a cooperative and willing participant in the interview process. He comprehended the questions asked and answered appropriately. The state notes that by suggesting in his first statement that what happened was an accident, Jordan attempted to extricate himself from culpability and that this evidenced his comprehension of his circumstances. The state asserts that the totality of the evidence supports the trial court’s denial of the motion to suppress.
In reviewing the correctness of the trial court’s pretrial ruling on a motion to suppress, the appellate court may review the entire record, including testimony at trial. State v. Jackson, 26,138 (La.App.2d Cir. 08/17/94), 641 So.2d 1081. We review the trial court’s ruling on a motion to suppress under the manifest error standard for factual determinations, while applying a de novo review to findings of law. State v. Hemphill, 41,526 (La.App.2d Cir.11/17/06), 942 So.2d 1263, writ denied, 2006-2976 (La.3/9/07), 949 So.2d 441. We defer to the trial court’s findings unless they are not adequately supported by reliable evidence. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272.
While the burden is on the defendant to prove the ground of his motion to suppress, the state has the burden or proving the admissibility of a purported confession. La. C. Cr. P. art. 703(D). The state must prove beyond a reasonable doubt the free and voluntary nature of the confession. State v. Roddy, 33,112 (La.App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, 2000-1427 (La.5/11/01), 791 So.2d 1288. The testimony of the interviewing police officers alone may be sufficient to prove that the defendant’s statement was given freely and voluntarily. State v. Bowers, 39,970 (La.App.2d Cir.8/19/05), 909 So.2d 1038. Voluntariness is determined on a case-by-case basis, under a totality of the circumstances standard. State v. Manning, 2003-1982 (La.10/19/04), 885 So.2d 1044, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005).
Low intellect, moderate retardation or diminished mental capacity does not per se and invariably vitiate capacity to make a *1267 free and voluntary statement or a knowing and intelligent Miranda waiver. State v. Beaner, 42,532, p. 15 (La.App.2d Cir.12/5/07), 974 So.2d 667, 676 citing State v. Manning, supra. The critical factor is whether the defendant was able to 11 understand the rights explained to him and voluntarily gave a statement. State v. Tart, 93-0772 (La.2/09/96), 672 So.2d 116, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996).
Our review of the entire record supports the trial court’s ruling on the defendant’s motion to suppress. The testimony of the SPD officers established that the defendant was advised of his Miranda rights prior to each recorded statement and waived those rights, as evidenced by waiver cards signed on December 23 and 29, 2008, and introduced into evidence. There was no evidence that Jordan made the statements as result of fear, duress, intimidation, menaces, threats, inducements or promises, as alleged in his boilerplate motion to suppress. We note that Jordan was not under arrest on December 23, 2008, when he made a spontaneous statement to Burak and when he gave a recorded statement to Demery and Hinderber-ger. Also, Jordan initiated the interview on December 29, 2008. The evidence, including the recorded statements, shows that Jordan was a cooperative and willing participant in the interviews.
No evidence of diminished capacity or low intellect was introduced at the hearing on the motion to suppress or during the guilt phase of the trial. The defendant’s poor behavior in court that resulted in a contempt violation and his apparent indifference while L.K. was hospitalized do not establish that Jordan lacked the mental capacity to understand his constitutional rights, waive them, and give a free and voluntary statement. The officers testified that Jordan did not appear under the influence of drugs or alcohol when he made his statements and did not appear to have any mental | ^impairment. Rather, the record shows that Jordan understood the questions asked and provided coherent answers. During the second interview, Jordan’s repeated insistence that he did not act intentionally showed his understanding of his situation and his calculated efforts to get a lesser charge. Jordan’s actions belie any claim that his alleged low intellect precludes a finding that he knowingly and intelligently waived his rights and freely and voluntarily gave statements to the police.
We find that the trial court’s denial of Jordan’s motion to suppress was supported by reliable evidence. This assignment of error lacks merit.

Jp0Jp(B) Evidence

In this assignment of error, Jordan argues that he was prejudiced by the state’s improper introduction of other crimes evidence. Jordan was previously charged with cruelty to a juvenile and entered a guilty plea to simple battery for giving a crying five-year-old girl a prescription antipsychotic medication to quiet her. The state sought to introduce this evidence to counter any defense that Jordan’s actions were unintentional and that L.K. was injured accidentally as a result of rough play. On August 18, 2010, the trial court conducted a hearing on the admissibility of the evidence under La. C.E. art. 404(B) and determined the evidence to be admissible at trial to show lack of mistake or accident.
At trial, the state began its case against Jordan with testimony concerning his prior offense. Ashley Bradford, who witnessed the incident, said that the child was being a normal five-year-old, running around and playing. Jordan got mad because the child would not stop. Bradford saw |13 Jordan chop a pill and put it into a can of *1268 soda, which he gave to the child to drink. Bradford testified that the child then settled down on the floor. Later, when relatives came home and realized that the child was not moving, Bradford told the child’s grandparents what happened. The police were called, and the child was taken to the hospital in an ambulance.
Dr. Virginia Quinones, the neonatologist who treated the child at Minden Medical Center, testified that the drug given to the child by Jordan was Seroquel. She explained that the drug can be used to treat antipsychotic disorders in children ages 10 to 17, but the proper dosage would be 25 to 30 mg once or twice a day, as opposed to the 300 mg pill used by Jordan. Dr. Quinones believed that the child likely got less than the full 300 mg dose.
Officer Wayne Young of the Minden Police Department investigated the incident. After advising Jordan of his rights, Young asked him what happened. Jordan told him that the child would not quit crying and yelling, so he crushed what he described as a sleeping pill and gave it to her in some Coca-Cola. Jordan did this so that the child would be quiet and go to sleep.
Appellate counsel now argues that the other crimes evidence was not relevant to whether Jordan had specific intent to kill or inflict great bodily harm on L.K. Counsel notes that Jordan, who was 17 at the time of the prior offense and had “mental defects, a very low intelligence, improper coping mechanisms, and a temper,” merely gave a prescription medication to a child to settle her. He further argues that the evidence served only to prejudice the jury against Jordan.
114La. C.E. 404(B)(1) states:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
For evidence of other crimes to be admissible, the state must: (1) prove by clear and convincing evidence that the other acts or crimes occurred and were committed by the defendant; (2) demonstrate that the other acts fall within the exceptions stated in La. C.E. art. 404(B)(1); (3) show that the evidence tends to prove a material fact at issue or to rebut a defense; and (4) show that the probative value of the evidence outweighs its prejudicial effect. La. C.E. arts. 403 and 404(B); State v. Brooks, 45,778 (La.App.2d Cir.3/2/11), 58 So.3d 506, writ denied, 2011-0631 (La.10/7/11), 71 So.3d 309.
Jordan was charged with first degree murder, which requires proof of specific intent to kill or to inflict great bodily harm. La. R.S. 14:30. When intent is an essential element of the crime charged, it is proper to admit proof of similar but disconnected crimes, wrongs, or acts to show the intent with which the act charged was committed. State v. Bruce, 47,055 (La.App.2d Cir.5/25/12), 93 So.3d 717, citing State v. Jackson, 625 So.2d 146 (La.1993).
| ifiThe trial court’s ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. State v. Bruce, supra. More *1269 over, the erroneous introduction of other crimes evidence is subject to review for harmless error. State v. Roberson, 40,809 (La.App.2d Cir.4/19/06), 929 So.2d 789. In reviewing for harmless error, the appropriate inquiry is whether it appears “beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.” Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94.
The record shows that the state proved by clear and convincing evidence that the other crime occurred and was committed by Jordan. The circumstances of the prior offense and the instant offense are similar in that.both involved Jordan using force or illegal means to make a child be quiet. The evidence fell within the exceptions provided in La. C.E. art. 404(B) and was of probative value. In his statements to the police, Jordan first claimed that L.K.’s death was the accidental result of rough play and then he repeatedly insisted that his actions were unintentional. Thus, evidence that Jordan acted intentionally and illegally to make another child be quiet was admissible to prove his specific intent in his actions toward L.K. and that his actions were not done by mistake or accident. It was also relevant to show that Jordan knew from his prior conviction that he could not choose to resolve his frustration with a noisy or crying child by committing a criminal offense that would harm the child. ■ Considering the minor nature of the prior offense in relation to the charged offense, the probative value of the __[i£other crimes evidence outweighed any prejudicial effect it might have had on the jury. The unsupported allegations regarding Jordan’s intellect and temper have no bearing on the admissibility of the other crimes evidence in this case.
Furthermore, even if it was error to admit the other crimes evidence, we would find it to be a harmless error. The evidence-of Jordan’s guilt was overwhelming and would have resulted in his conviction in the absence of the other crimes evidence. The' testimonial and other evidence of'L.K’s severe and massive head injuries, together with Jordan’s statements to the police admitting that he hit and shook her repeatedly and threw her in her car seat, were sufficient to establish his guilt such that we can conclude beyond a reasonable doubt that the error complained of did not contribute to the guilty verdict. We find no abuse of discretion by the trial court and no merit to this assignment of error.

Motions for Continuance

Appellate counsel contends that the- trial court abused its discretion by denying the motions to continue filed by trial counsel. He claims that the denial impacted the ability of trial- counsel to develop evidence to show that Jordan had some mental defect or such low mental capacity that his' statements were involuntary, that he could not form specific intent to kill or inflict great bodily harm on L.K., and that would rebut the relevance of the evidence of his prior bad acts.
On April 11, 2012, defense counsel filed a motion to continue the July 23, 2012, trial setting. The defense asserted that it could not complete Inadequate mitigation investigation by the triál date and that more time was needed to determine whether to file notice under La. C. Cr. P; art. 905.5 to exempt Jordan from capital punishment. In support of its motion, the defense noted that most of its investigation was taking place out of state, because Jordan had lived the first 12 years of his life in Washington. Defense- counsel also asserted that his caseload would prevent him from preparing for the July trial 'and that *1270 he would be unable to provide effective representation to Jordan if no continuance was granted. On April 19, 2012, trial counsel amended the 15-page motion to continue to include more details concerning his caseload, the number of capital-qualified attorneys in the Caddo Parish Public Defender’s Office, and budget information.
The trial court heard arguments on the motion to continue on April 11 and 19, 2012. The state argued that more than three years had passed since Jordan’s indictment, that defense counsel’s caseload was not likely to change, and that the defense could not say when, if ever, it would be ready to proceed. Defense counsel suggested that he would need another six to 12 months to prepare, but he claimed he could not provide further details without breaching confidentiality.
Noting that the case had previously been set for December 2011, that the public defender’s caseload was always going to be heavy, and that extra expenses and preparations are required by the court for trial of a capital case, the trial court denied the motion to continue. Although the trial court heard more arguments for a continuance on May 30, 2012, the trial court | isagain denied the defense’s motion and maintained the July 23, 2012, trial setting.
Defense counsel filed for supervisory review of the trial court’s ruling. This court declined to exercise its supervisory jurisdiction and denied Jordan’s writ on May 31, 2012. The supreme court also declined to consider Jordan’s writ on July 6, 2012, on the grounds that it was untimely.
On July 16, 2012, the defense, which now included three capital-qualified attorneys, filed another motion to continue the trial. They argued that a continuance was warranted because (1) the mitigation investigation was not complete; (2) they had not yet interviewed or identified culpability phase witnesses who may have been with Jordan around the time of the offense; (3) a report received on July 2, 2012, suggested that Jordan suffered from a mental defect, fetal alcohol syndrome, and that additional time would be required to determine whether such defect might render Jordan ineligible for the death penalty, warrant an insanity defense, or call into question the voluntariness of his confession; (4) the mitigation expert would be unavailable for the trial date; and (5) the defense had not yet issued out-of-state subpoenas.
Attached to the motion were affidavits from the three defense counsel generally claiming that they would not be able to render effective assistance of counsel because they had not prepared and/or would be unable to prepare for trial due to caseload obligations. The defense also attached affidavits from “mitigation experts,” who had already been paid thousands of dollars for their expertise and who provided a seemingly inexhaustible listing of 11fladditional witnesses and interviews left to be addressed, upon receipt of additional funding.
The motion for a continuance, along with motions to withdraw filed by the three defense counsel, were argued on July 18, 2012. The state argued there was no showing that the defense would be prepared if the trial date was continued, particularly since the state public defender board was refusing to cover additional fees for mitigation work. Noting that the affidavits attached to the continuance motion showed that a significant amount of mitigation work had been done, the state asserted that the defense was simply employing a strategy to delay the trial and set up a claim of ineffective assistance of counsel by not preparing (or claiming not to be prepared) for trial. The state also asserted that the defense had failed to timely provide expert reports dated from 2009 until July 2012.
*1271 The trial judge stated that he had been hearing similar arguments from other attorneys on capital cases.[3] Noting that the defendant had been indicted and arraigned in March 2009, that the state had filed notice of intent to seek the death penalty in August 2009, and that there had been three prior trial settings, the trial court concluded that 3⅜ years was ample Intime for the defense to prepare for trial and to do mitigation investigation. The trial court also noted that the defendant had been held without bail during the time his case had been pending and that he was considered a security risk. After much argument and discussion, the trial court found there was no basis to continue the trial date and denied the motion to continue. The trial court also denied the motions to withdraw.[4]
Upon a written motion at any time and after a contradictory hearing, the court may grant a continuance, but only upon a showing that such motion is in the interest of justice. La. C. Cr. P. art. 707. Additionally, the court has discretion to grant a timely filed motion for a continu-anee “in any case if there is good ground therefor.” La. C. Cr. P. art. 712. Because the decision to grant or deny a motion for continuance rests within the sound discretion of the trial court, a reviewing court will not disturb the trial court’s determination absent a clear abuse of discretion. State v. Free, 48,260 (La.App.2d Cir.11/20/13), 127 So.3d 956, writ denieds, 2013-2978 (La.5/30/14), 140 So.3d 1174 and 2014-0039 (La.9/19/14), 148 So.3d 944.
The denial of motion for a continuance on grounds of counsel’s lack of preparedness does not warrant a reversal unless counsel demonstrates specific prejudice resulting from the denial, or the preparation time is so |¾1 minimal as to call into question the basic fairness of the proceeding. State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832. Generally, a reviewing court will not reverse a conviction even on á showing of an improper denial of a motion for a continuance, absent a showing of specific prejudice. Free, supra.
As stated, appellate counsel argues that the denial of a continuance impacted the *1272 ability of trial counsel to develop evidence of Jordan’s alleged mental defect so as to show his lack of voluntaiiness in making his statements to the police, to rebut the relevance of the evidence of his prior bad acts, and to show that he could not form specific intent. However, Jordan offers no explanation of how the defense was prevented in these preparations in the three years prior to trial, and the record does not suggest that the outcome of the trial would have been different if continued. The record shows that despite the arguments concerning caseload and funding issues, the defense had three experts to investigate mitigation evidence and three years to investigate any possible mental status issue that might have aided the defense.
At the hearing on the motion to suppress, all the police officers testified that Jordan did not show any signs of mental impairment and never indicated that he had difficulty understanding his rights or the questions he was asked. The defense offered no evidence at the motion to suppress hearing to indicate otherwise. Though the defense gave notice that a defense of mental impairment would be introduced at trial, the defense didj^not present any evidence during the guilt phase of the trial to demonstrate that Jordan had a mental deficiency or low intellect.[5]
Considering the overwhelming evidence of Jordan’s guilt, it appears that the defense made the strategic decision to deploy its arguments and evidence concerning Jordan’s mental status at the sentencing hearing. The defense called two ministers who knew Jordan, a mental health specialist who had worked with Jordan during his teen years, two of Jordan’s aunts, and his mother. The defense also presented expert testimony from a forensic and clinical psychiatrist, a clinical neuropsychologist, and a clinical and forensic psychologist. Despite repeated claims of unpreparedness, the record shows that the defense was able to provide sufficient mitigating evidence to dissuade the jury from imposing the death penalty. The trial court referred to the defense’s efforts as one of the finest mitigation presentations he had seen in 20 years of practice.
We find no abuse of discretion by the trial court in denying a continuance. The record shows that the trial court thoroughly and thoughtfully considered the defense’s motions and was not persuaded that there were good grounds for a continuance or that continuing the trial date would serve the interest of justice. We find that the preparation time was not so minimal as to call into question the basic fairness of the proceedings 1 Mand that there is no showing of specific prejudice resulting from the denial of the motions for continuances. This assignment of error is without merit.
CONCLUSION
For the reasons stated in this opinion, we affirm the defendant’s conviction for first degree murder and his life sentence.
AFFIRMED.

. Sunday, December 21, 2008.

. The neighbor was Laqúita Griffin, who testified at trial, and whom Jordan referred to in his statement as "Quita.”

. The trial judge opined that the creation of the state public defender board had resulted in a situation that was adversely affecting the trial courts’ control over the docket and how trials proceed. The inequitable allocation of resources among capital cases and the strategies being employed in seeking continuances were discussed. The trial court opined that capital defenders appear to be employing a systematic approach involving the use of "mitigation experts” to do what the Code of Professional Responsibility requires counsel to do and then to allege delays or the failure of the mitigation experts to complete their investigation as a ploy to continue capital trials. Even defense counsel agreed that the creation of the public defender board has been a step back rather than an improvement for indigent defense. Although the defense claimed otherwise in its motions to continue, this record shows that the defense was prepared and effective both during the guilt phase, where the state's evidence of the defendant's guilt was overwhelming, and penalty phase, during which the defense presented significant mitigation evidence and succeeded in allowing the defendant to avoid the death penalty.

. On July 27, 2012, defense counsel again filed motions to withdraw on the grounds that a conflict of interest had developed between them and the defendant due to accusations by the state that they had violated the Rules of Professional Conduct. After much argument, the trial court determined that no such conflict existed and denied the motions to withdraw. The trial court noted that it was the defense which had first asserted, in arguing for a continuance, that their alleged lack of preparedness would be a violation of the Rules of Professional Conduct. The trial court observed that if defense counsel really believed they were unprepared such that they would be in violation of the Rules of Professional Conduct, then they had an obligation to self-report any violation.

. On July 20, 2012, the defense filed a notice ■ of intent to pursue an intellectual disability defense to the death penalty pursuant to La. C. Cr. P. art. 905.5.1. However, during the sentencing hearing, the trial court learned that the defense had notice since September 2010 of the possibility of that defense. Noting that the report relied on by the defense fell short of concluding that the defendant had an intellectual disability as contemplated by La. C. Cr. P. art. 905.5.1, the trial court granted the state’s motion to prohibit the defense of intellectual disability as a bar to the death penalty.