Judgment rendered July 16, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,301-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

Versus

TATIANNA JENELL BURNS                       Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 377,592

Honorable Donald E. Hathaway, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT              Counsel for Appellant
By: Alex James Washington

JAMES E. STEWART, SR.                    Counsel for Appellee
District Attorney

JASON W. WALTMAN
CHRISTOPHER BOWMAN
MARGARET E. RICHIE GASKINS
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and ELLENDER, JJ.

**STEPHENS, J.,**

This criminal appeal arises from the First Judicial District Court, Parish of Caddo, State of Louisiana, the Honorable Donald Hathaway, Jr., Judge, presiding. The defendant, Tatianna Jenell Burns ("Burns"), was indicted by a grand jury for the second degree murder of the minor child, A.W., a violation of La. R.S. 14:30.1. Following Burns' waiver of her right to trial by jury, a bench trial was held. The trial court found Burns guilty as charged and sentenced her to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. Burns appeals her conviction. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

The victim, A.W., a minor child, was born on December 6, 2018. On June 6, 2019, the mother of the child, Antoinette Wong, signed a Child Care Authorization form granting the defendant, Tatianna Burns (Washington), and her husband, Kevin Washington, the authority to take temporary care of the child. Their authority over and care for the child began on August 7, 2019. Over the next several months, Burns and Washington developed an arrangement with Cornell Jackson to care for A.W. for approximately three days a week while Burns and Washington were at work.

On June 5, 2020, Washington, employed by Loomis Armored, left for work around 7:00 a.m. while the child was still asleep.[1] Later that afternoon, around 2:00 p.m., Burns brought A.W. to Jackson's residence as Burns had to work that afternoon. In Jackson's original statement to officers, he indicated that A.W. was asleep when Burns arrived, and that Burns placed

_____

[1] Timecards from Loomis Armored confirm that Washington was at work from 7:12 a.m. to 5:45 p.m.

the child on the bed or couch before leaving for work. Eventually, Jackson became concerned about the child's wellbeing. He ultimately contacted Burns with his concerns and relayed to Burns his belief that something was wrong with A.W. Burns returned to Jackson's residence, and once she arrived, Burns observed that A.W. was not breathing. Burns stated that she began CPR on the child.

After allegedly performing CPR, Burns brought A.W. to Willis Knighton North Hospital. The child, after having been intubated and placed on a ventilator, was then transferred by ambulance to Willis Knighton South Hospital where an intensive care unit, pediatric unit, and pediatric specialists were located. Dr. Minh Tran, a pediatric critical care physician, began treating A.W. The child was unresponsive and was placed on an epinephrine drip to keep her heart beating. Dr. Tran diagnosed A.W. with bleeding on several layers of her brain (subdural hematomas) and swelling of her entire brain (edema). Because of this swelling, the child's brain herniated, i.e., her brain was pushed down through the hole at the base of her skull. The nature of A.W.'s injuries and the conversation Dr. Tran had with Burns prompted Dr. Tran to alert law enforcement that A.W.'s injuries may have resulted from child abuse.

On June 10, 2020, A.W. succumbed to her injuries. Following the child's death, Dr. Jin Long performed an autopsy and concluded that A.W.'s manner of death was homicide, and the cause of death was abusive head trauma. The SPD officers' investigation led to the court issuing an arrest warrant on August 4, 2020. Burns was arrested the next day, August 5, 2020. On November 18, 2020, Burns was indicted by a Caddo Parish grand jury for one count of second degree murder, a violation of La. R.S. 14:30.1.

2

On July 8, 2024, Burns filed a handwritten motion to exercise her right to waive a trial by jury and electing her right to be tried by the judge. The motion reflected Burns' desire to knowingly and intelligently waive a trial by jury and elect to be tried by the judge and indicated that after a colloquy with the trial court, she desired to irrevocably waive a trial by jury.[2] Both counsel for Burns and Burns signed the motion, and the trial court granted the motion. A bench trial commenced on July 10, 2024.

At trial, Dr. Tran, accepted as an expert in the field of pediatric critical care, testified that he was A.W.'s doctor at Willis Knighton South on June 5, 2020. When A.W. arrived at the hospital, she was intubated, on a ventilator, on cardiac support, and on an epinephrine drip to keep her heart beating, but the child was not responsive. Imaging showed that A.W. had brain bleeds on several layers of her brain as well as swelling of her whole brain. Dr. Tran indicated that the herniation and the edema are what ultimately caused A.W.'s death. Dr. Tran also testified that the injuries that caused this herniation and swelling resulted from acute injuries, meaning the injuries had occurred within several days. He clarified that the injuries could not have existed for six months, and he stated it was highly unlikely that any child with this level of trauma could act normal.

A.W.'s injuries also included significant hemorrhaging in her eyes. Dr. Tran stated that repetitive shaking motions can manifest these injuries, and he informed the court that seizures could not have caused the injuries that A.W. sustained and suffered. According to Dr. Tran and his notes from

_____

[2] Although the colloquy is referenced in the motion, there is no transcript of it found in the record. The minutes reflect that Burns was present with counsel, and the ADA was present as well.

3

treating A.W., he felt compelled to reach out to law enforcement because the injuries she suffered made him suspect abusive trauma. He indicated that after speaking with Burns about A.W.'s medical history and activities prior to the incident, Dr. Tran felt there were gaps in the story that did not add up.

Dr. Jennifer Rodriguez also testified at Burns' trial as an expert in the field of child abuse pediatrics. Given A.W.'s injuries, Dr. Rodriguez concluded that the child suffered from abusive head trauma. In her opinion, life-saving measures such as CPR would not account for the significant injuries A.W. sustained. Dr. Rodriguez related that the child could not live long with injuries like a brain edema. On cross-examination, Dr. Rodriguez indicated that the injuries could have occurred that same day (June 5, 2020), but the injuries would have occurred before any alleged seizure activity.

The next medical expert to testify at trial was Dr. John David Hinrichsen, a private practitioner with a specialty in pediatric ophthalmology. He informed the court that he examined A.W. on June 6, 2020. A.W.'s pupils were dilated, she was intubated, unresponsive, and on a ventilator. He stated that he is involved when children suffer subdural hematomas because eye or retinal hemorrhaging potentially indicates nonaccidental trauma. According to Dr. Hinrichsen, A.W. had too many hemorrhages to count in the back of her eye, and there were multiple layers in the eye. He discussed the various levels of retinal hemorrhages, and he compared A.W.'s injuries to those she would experience if she were in a car wreck. Dr. Hinrichsen also explained sheering, and noted that it can be caused by shaking, i.e., the shaking causes the blood vessels to pull and bleed in the back of the eye. He indicated that all the hemorrhages present were recent, occurring within a week or two of June 6, 2020.

4

Sergeant Stevie Gillis with the SPD testified that he was the first officer to respond to the hospital on June 5, 2020. Sgt. Gillis connected with Burns and took her statement once he discussed A.W.'s condition with Dr. Tran. Burns advised Sgt. Gillis that she attempted to give the baby CPR several times when she was aware that her behavior was strange. Sgt. Gillis also testified that Burns relayed information about the child's medical history, mentioning that she had a history of seizures. Following his interview with Burns, Sgt. Gillis contacted the on-call detective.

Detective Jennifer Gaddy was employed by the DeSoto Parish Sheriff's Office at the time of trial. At the time of A.W.'s incident, Gaddy served as an investigator in the SPD's Youth Services Bureau juvenile unit. Det. Gaddy testified that she made contact with Burns at the hospital and questioned her about A.W. and the child's medical history. Burns informed Det. Gaddy that A.W. had previously had one seizure when she was an infant. Burns indicated that A.W. had been playing and watching TV earlier that day but Burns, at one point, observed the child having a seizure. After consoling the child, Burns told Det. Gaddy that A.W. seemed fine and fell asleep in the car on the way to Jackson's home and remained asleep when Burns left for work.

Detective Stephen Herring testified that he was employed with the SPD's Violent Crimes Homicide Unit. Det. Herring indicated that he took Burns' recorded statement at the police department, and she signed the *Miranda* waiver form prior to questioning. Det. Herring testified that Burns was the only person who admitted to shaking A.W., but Burns stated it was done in reaction to the child being unresponsive. He indicated that given the

timeline provided by those interviewed in the investigation and the medical reports, A.W. was only in Burns' custody when the incident happened.

Other testimony at trial revealed that Burns and her husband had previous allegations made against them for child abuse. Jackson also testified at trial. However, he seemed extremely reluctant to do so; his responses were mainly, "I don't know nothing about that," or "I don't know." In the middle of the trial, Burns addressed the court and requested a continuance; she also stated that she wanted to change lawyers. However, the trial court denied her requests. At the close of trial and following a 15-minute recess, the trial court found Burns guilty of second degree murder.

The sentencing hearing took place on July 23, 2024. The court highlighted the aggravating circumstances and found that Burns' conduct during the commission of the of the offense manifested deliberate cruelty to the victim; she knew or should have known the victim was particularly vulnerable or incapable of resistance due to extreme youth; she used her position or status to facilitate the commission of the offense; and the offense resulted in the victim's death. The trial court also clearly articulated that there were no mitigating circumstances for Burns' actions. The court sentenced Burns to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Burns now appeals her conviction.

**DISCUSSION**

*Sufficiency of Evidence*

In her first assignment of error, Burns contends that the State failed to prove beyond a reasonable doubt that she caused the death of A.W. She maintains that while the State had various experts that testified during trial, not one expert could determine when A.W.'s injuries occurred. Because of

6

this, she suggests that the State failed to rule out the possibility of the child suffering from these injuries while in the care of the babysitter, Jackson.

On the other hand, the State asserts that it needed to prove that Burns killed A.W. either (1) intentionally, with the specific intent to kill or to inflict bodily harm, or (2) unintentionally, while Burns was committing the felony of cruelty to a juvenile. The State maintains that the child's injuries were caused by abusive head trauma rather than by a seizure or by efforts to resuscitate her. The State argues that the overwhelming amount of circumstantial evidence was sufficient for a reasonable factfinder to conclude that Burns shook and killed the child.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in light most favorable to the prosecution. When the

7

direct evidence is thus viewed, the facts established by the direct evidence and inferred from circumstantial evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Norman*, 51,258 (La. App. 2 Cir. 5/17/17), 222 So. 3d 96, *writ denied*, 17-1152 (La. 4/20/18), 240 So. 3d 926.

Direct evidence provides proof of the existence of a fact; for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So. 2d 1154 (La. 1985); *State v. Baker*, 49,175 (La. App. 2 Cir. 8/27/14), 148 So. 3d 217. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Broome*, 49,004 (La. App. 2 Cir. 4/9/14), 136 So. 3d 979, *writ denied*, 14-0990 (La. 1/16/15), 157 So. 3d 1127.

For a case resting essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Christopher*, 50,943 (La. App. 2 Cir. 11/16/16), 209 So. 3d 255, *writ denied*, 16-2187 (La. 9/6/17), 224 So. 3d 985. The appellate court reviews the evidence in the light most favorable to the prosecution and determines whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Calloway*, 07-2306 (La. 1/21/09), 1 So. 3d 417; *State v. Alexander*, 53,449, (La. App. 2 Cir. 11/18/20), 306 So. 3d 594, *writ denied*, 20-01449 (La. 6/22/22), 339 So. 3d 642; *State v. Garner*, 45,474 (La. App. 2 Cir. 8/18/10), 47 So. 3d 584.

La. R.S. 14:30.1 defines second degree murder as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm or when the offender is engaged in the perpetration or attempted perpetration of cruelty to juveniles, among other offenses. Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. La. R.S. 14:93(A)(1).

The testimony and evidence adduced at trial indisputably shows that the child died from non-accidental internal head trauma caused by excessive shaking. While we agree with Burns' assertion that there is no evidence directly linking her to the child's cause of death, the circumstantial evidence substantially shows that Burns's actions resulted in the child's death.

The medical testimony provided a general time frame in which the excessive shaking took place, within a week of the child's death. Most notably, Dr. Rodriguez opined that while the child's injuries could have occurred on June 5, 2020, the injuries would have occurred before any alleged seizure activity. Furthermore, each doctor agreed that any shaking that might have occurred while performing CPR would not have caused the fatal injuries. The judge clearly deduced from this evidence that Burns was the only person who had contact with the child in the time frame discussed by the doctors. Similarly, Burns' story about what happened to the child and when it occurred continued to change throughout the investigation, moving from the child hitting her head to the child having a history of seizures and suffering from one earlier on that date.

9

Despite Burns' suggestions that Jackson inflicted the injuries, Burns actually admitted to shaking the child on two occasions: once at home following the child's alleged seizure and once when returning to Jackson's home after Jackson communicated his concerns to Burns about the child's well-being. Little to no evidence suggests that Jackson inflicted the injuries, and the judge heard Jackson's testimony and had the chance to assess his credibility. Evidence was also introduced at trial of a prior incident where a different child was taken from Burns' care following a DCFS investigation. Viewing the evidence in light most favorable to the prosecution, we see no other reasonable hypothesis in the cause of death of the minor child, and Burns' argument that the State failed to prove beyond a reasonable doubt that she caused the death of A.W. is without merit.

*Jury Trial Waiver*

Next, Burns asserts that the trial court erred in granting the motion to waive a jury trial because her right to trial by jury was not knowingly and intelligently waived. Burns maintains that the court initially set a trial date for November 2, 2021, but the case was reset several times. Eventually, the jury trial was set to begin on July 8, 2024, but Burns explains that her counsel of record handwrote on a sheet of paper "Waiver of Jury Trial." Counsel then had Burns sign the document without any prior conversations, the trial court granted the motion, and a bench trial commenced on Wednesday, July 10, 2024. Burns urges that these circumstances are contrary to law and jurisprudence as she was given the waiver on the morning the trial was to begin, and the waiver was handwritten.

Although Burns argues that her jury trial waiver was invalid, the State urges that a defendant may waive a trial by jury within 45 days prior to the

10

commencement of trial with the consent of the district attorney. The State

proposes that the purpose of the 45-day time limit is not to protect the

defendant from making a hasty decision, but rather, it is to protect the State

from improper dilatory practices by the defendant.

La. C. Cr. P. art. 780 states:

> A. A defendant charged with an offense other than one punishable by death may knowingly and intelligently waive a trial by jury and elect to be tried by the judge.

> B. The defendant shall exercise his right to waive trial by jury in accordance with Article I, Section 17 of the Constitution of Louisiana. The waiver shall be by written motion filed in the district court not later than forty-five days prior to the date the case is set for trial. The motion shall be signed by the defendant and shall also be signed by defendant's counsel unless the defendant has waived his right to counsel.

> C. With the consent of the district attorney the defendant may waive trial by jury within forty-five days prior to the commencement of trial.

> D. A waiver of trial by jury is irrevocable and cannot be withdrawn by the defendant.

Not only does La. C. Cr. P. art. 780 require a written waiver, but Louisiana

jurisprudence holds that a defendant's knowing and intelligent waiver of his

right to a jury trial must be sufficiently demonstrated by the record. *State v.*

*Muller*, 351 So. 2d 143 (La. 1977); *State v. White*, 52,530 (La. App. 2 Cir.

5/8/19), 269 So. 3d 1182; *State v. Morris*, 49,987 (La. App. 2 Cir. 9/30/15),

178 So. 3d 1028; *State v. Robinson*, 48,819 (La. App. 2 Cir. 2/26/14), 136

So. 3d 302; *State v. Hicks*, 41,906 (La. App. 2 Cir. 12/20/06), 945 So. 2d

959; *State v. Davis*, 41,180 (La. App. 2 Cir. 11/3/06), 942 So. 2d 1196. The

record on appeal must show some manifestation of an effective waiver.

*State v. White*, *supra*; *State v. Morris*, *supra*.

11

A valid waiver of trial by jury occurs only if the defendant acted voluntarily and knowingly. *State v. Kahey*, 436 So. 2d 475 (La. 1983); *State v. White*, *supra*. In making the determination of whether a defendant made a voluntary and knowing waiver, a trial court is required to determine only whether the defendant's waiver was made knowingly and intelligently. *State v. White*, *supra*; *State v. Campbell*, 42,099 (La. App. 2 Cir. 6/20/07), 960 So. 2d 363. The preferred method is for the district court to advise a defendant of the right to trial by jury in open court before obtaining a waiver, but such a practice is not statutorily required. *State v. White*, *supra*; *State v. Robinson*, *supra*; *State v. Campbell*, *supra*. Likewise, it is also preferred, but not necessary, for the defendant to waive the right to a jury trial personally. *State v. Pierre*, 02-2665 (La. 3/28/03), 842 So. 2d 321. Defense counsel may waive the right on the defendant's behalf, provided that the defendant's decision to do so was made knowingly and intelligently. *Id*.

While the trial judge must determine if a defendant's jury trial waiver is knowing and intelligent, that determination does not require a *Boykin*-like colloquy. *State v. White*, *supra*; *State v. Robinson*, *supra*; *State v. Campbell*, *supra*. Prior to accepting a jury trial waiver, the trial court is not obligated to conduct a personal colloquy inquiring into a defendant's educational background, literacy, and work history. *Id*. Additionally, nothing in the statutes or the jurisprudence requires the trial judge to inform a defendant of the details involving the number of jurors and the votes necessary for a conviction. *Id*.

The record contains a handwritten motion signed personally by Burns and her counsel of record. Similarly, the minutes of the trial court indicate that the waiver was filed on July 8, 2024, by the defendant in proper person,

and it is represented to this Court that Burns, Burns' counsel, an Assistant District Attorney, and the trial judge were present in court on that date. The transcript also references Burns' decision to waive the right to trial by jury at the beginning of the proceedings and in the middle of the trial. Similarly, the District Attorney's office states on record that it is ready to proceed with the bench trial. A signed, written waiver is present in the record as required by La. C.Cr.P. art. 780 as well as several instances in the record manifesting an effective waiver. Given these reasons, we see no reason to reject Burns' written jury trial waiver. Therefore, her second assignment of error claiming that she did not knowingly and voluntarily waive her right to trial by jury is without merit.

## *Motion for Continuance*

In her final assignment of error, Burns urges that the trial court erred in denying her motion for a continuance of the trial. Burns maintains that she requested a continuance believing that the State should have provided her with an expert report. Burns notes that the trial court granted two of the State's continuances, first on November 2, 2021, and next on January 8, 2024, and one of her motions for continuance on January 8, 2024. While the matter was continued on multiple occasions, Burns suggests that the trial court's failure to allow the same number of continuances for both parties showed specific prejudice to her. The State suggests that the July 3, 2024, transcript from the continuance hearing indicates that the trial court did not abuse its discretion by denying Burns' oral motion to continue. According to the State, Burns was given over five months between notice of the State's expert witnesses and her trial date.

Upon a written motion at any time, the trial court may grant a continuance, but only upon a showing that such a motion is in the interest of justice. La. C. Cr. P. art. 707. The decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such a determination absent a clear abuse of discretion. La. C. Cr. P. art. 712; *State v. Sanders*, 52,632, (La. App. 2 Cir. 5/22/19), 273 So. 3d 635, *writ denied*, 19-01106 (La. 7/17/20), 298 So. 3d 169; *State v. Sullivan*, 52,204 (La. App. 2 Cir. 8/15/18), 253 So. 3d 911. Whether a refusal to grant a continuance was justified depends on the circumstances of the particular case presented. *State v. Snyder*, 98-1078 (La. 4/14/99), 750 So. 2d 832; *State v. Sanders*, *supra*. Generally, a reviewing court will not reverse a conviction even on a showing of an improper denial of a motion for a continuance, absent a showing of specific prejudice. *State v. Snyder*, *supra; State v. Sanders*, *supra*; *State v. Jordan*, 50,002 (La. App. 2 Cir. 8/12/15), 174 So. 3d 1259*, writ denied*, 15-1703 (La. 10/10/16), 207 So. 3d 408.

On July 3, 2024, the trial court held a continuance hearing where Burns requested a continuance because the State had failed to produce an expert report. In reply, the State indicated that it provided open file discovery and highlighted each medical professional it intended to call and certify as expert witnesses, including Dr. Jin, Dr. Tran, Dr. Hinrichsen, and Dr. Rodriguez. The State clarified that Dr. Tran, Dr. Hinrichsen, and Dr. Jin each had documented treatment of the child in the medical records or the autopsy report. However, Dr. Rodriguez would not have an expert report; therefore, no report existed to tender to Burns; however, the State relayed that it filed, signed, and served a La. C. Cr. P. art. 719 notice on January 3,

2024, containing Dr. Rodriguez's CV. The trial court ultimately denied Burns' motion for a continuance, reasoning that the State merely had the burden of proving when the injuries occurred rather than producing an expert report stating when the injuries occurred.

Throughout the proceedings, the trial court granted several continuances to both the State and to Burns. The hearing on the continuance motion at issue took place about one week before the trial was scheduled to take place. Given that the State had open file discovery, the State had previously filed a notice for Dr. Rodriguez on January 3, 2024, and the small amount of time between the continuance hearing and the trial date, we find that the trial court was well within its broad discretion to deny Burns' motion. Not only was there no abuse of discretion on behalf of the trial court, but nothing in the record suggests that this denial showed specific prejudice towards Burns. Similarly, we find that the trial court was within its discretion in denying Burns' oral motion for a continuance that she made in the middle of the trial. Consequently, Burns' third assignment of error has no merit.

## CONCLUSION

Finding no errors patent and for the reasons expressed herein, Tatianna Burns' conviction for second degree murder is affirmed.

**AFFIRMED.**

15